# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

**GORDON SCHIFF** and **CELESTE ROYCE**,

*Plaintiffs*,

v.

**U.S. OFFICE OF PERSONNEL MANAGEMENT**; **CHARLES EZELL**, in his official capacity as Acting Director of the U.S. Office of Personnel Management; **U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES**; **ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of Health and Human Services; **AGENCY FOR HEALTHCARE RESEARCH AND QUALITY**; and **MAMATHA S. PANCHOLI**, in her official capacity as Acting Director of the Agency for Healthcare Research and Quality,

*Defendants*.

</td><td>

Case No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

</td></tr>
</table>

## INTRODUCTION

1.     This lawsuit seeks declaratory and injunctive relief from the Trump Administration's unlawful and dangerous suppression of doctors' speech about how to better diagnose patients. Every year, approximately 795,000 Americans die or are permanently disabled due to misdiagnosis. Allowing the government to censor research regarding patient safety for political reasons will almost assuredly increase that number.

2.     Yet the Agency for Healthcare Research and Quality ("AHRQ"), an agency within the U.S. Department of Health and Human Services ("HHS"), has removed private doctors' peer-reviewed articles from a patient safety website solely because they happen to contain the terms "LGBTQ" and "transgender," among other newly forbidden words. AHRQ stated that it would republish the articles only on the condition that the doctors agree to remove the forbidden terms.

3.      AHRQ removed these articles to comply with guidance issued by the U.S. Office of Personnel Management ("OPM"), ordering all agencies to "[t]ake down all outward facing media . . . that inculcate or promote gender ideology." OPM issued that guidance to implement President Trump's January 20, 2025, executive order directing federal agencies to remove all statements that "promote or otherwise inculcate gender ideology."

4.      Plaintiffs are two doctors and Harvard Medical School professors who refused to censor their medical conclusions to bend to this political fiat. They bring this lawsuit to defend the integrity of medical research and the safety of patients from the government's dangerous, arbitrary, and unconstitutional censorship.

5.      Defendants' censorship violates the First Amendment by imposing a viewpoint-based and unreasonable restriction on Plaintiffs' speech and violates the Administrative Procedure Act ("APA") because it is arbitrary and capricious. The OPM guidance further violates the APA because it exceeds OPM's statutory authority. Plaintiffs request that the Court declare this censorship unlawful, restore Plaintiffs' censored research, and enjoin Defendants from further censoring research.

## JURISDICTION AND VENUE

6.      The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the United States Constitution and the APA, 5 U.S.C. § 551 *et seq*. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

7.      Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because this action seeks relief against agencies of the United States and Plaintiffs both reside in this district.

## PARTIES

**A.    Plaintiffs**

8.    Plaintiff Gordon Schiff, M.D., is an Associate Professor of Medicine at Harvard Medical School who lives in Boston, Massachusetts. He has practiced medicine as a primary care physician since 1976 and continues to see patients at Brigham and Women's Hospital. At both Harvard Medical School and Brigham and Women's Hospital, Dr. Schiff has overseen several centers, committees, and conferences focused on patient safety. He is a founding member of both the Society to Improve Diagnosis in Medicine and the American Public Health Association's Quality Improvement Committee. Throughout a career spanning four decades, Dr. Schiff has researched, taught, and written about patient safety, diagnosis error, and medication safety. He has authored over two hundred papers and chapters on those topics and has served in an editorial role for dozens of medical journals.

9.    Plaintiff Celeste Royce, M.D., is an Assistant Professor of Obstetrics, Gynecology, and Reproductive Biology at Harvard Medical School who lives in Boston, Massachusetts. She has practiced medicine as a staff physician since 1993 and works in the Department of Obstetrics and Gynecology at Beth Israel Deaconess Medical Center ("Beth Israel"). Dr. Royce is a member of the Quality Assurance and Clinical Competency Committees for the Department of Obstetrics and Gynecology at Beth Israel, has led the Quality Improvement Committee for the Gynecology Service, and is the vice chair of the Clerkship Education Committee at Harvard Medical School. Dr. Royce is a Fellow of the American College of Obstetricians and Gynecologists and several other societies. Throughout her career, Dr. Royce has researched, taught, and written about general obstetrics and gynecology. One of her areas of scholarly interest is the role of clinical reasoning in improving patient safety. Dr. Royce has authored or co-authored several dozen articles discussing

ways to improve medical education and increase patient safety, especially within obstetrics and gynecological education, and she has served on editorial boards for multiple medical publications.

**B.    Defendants**

10.    Defendant U.S. Office of Personnel Management ("OPM") is an independent federal agency located in Washington, D.C. OPM serves as the chief human resources agency and personnel manager for the federal government. OPM is a federal agency within the meaning of the APA. 5 U.S.C. § 551(1).

11.    Defendant Charles Ezell is the Acting Director of OPM. He is responsible for supervising and directing OPM. He is sued in his official capacity only.

12.    Defendant U.S. Department of Health and Human Services ("HHS") is a cabinet-level department within the executive branch of the federal government located in Washington, D.C. HHS oversees the federal government's public health, social services, medical, and scientific efforts. HHS is a federal agency within the meaning of the APA. 5 U.S.C. § 551(1).

13.    Defendant Robert F. Kennedy, Jr. is the Secretary of Health and Human Services. He is responsible for supervising and directing HHS. He is sued in his official capacity only.

14.    Defendant Agency of Healthcare Research and Quality ("AHRQ") is an executive branch agency within the federal government and a component of HHS, headquartered in North Bethesda, Maryland. AHRQ's mission is to enhance the quality, appropriateness, and effectiveness of healthcare services by consolidating and disseminating scientific research to improve clinical and health system practices. AHRQ is a federal agency within the meaning of the APA. 5 U.S.C. § 551(1).

15.    Defendant Mamatha S. Pancholi is the Acting Director of AHRQ. She is responsible for supervising and directing AHRQ. She is sued in her official capacity only.

## FACTUAL BACKGROUND

**A.    Medicine Prioritizes Efforts to Continuously Improve Patient Safety**

16.    Patient safety is a first-order priority in the practice of medicine. The Hippocratic Oath commands, "First, do no harm." The ability to identify and learn from medical errors is central to improving the practice of medicine and protecting patient safety.

17.    Patient safety is the "freedom from accidental or preventable injuries produced by medical care."[1] Practices that improve patient safety reduce the occurrence of preventable adverse events, including those caused by medical errors.[2] Despite tremendous advancements in the practice of medicine, doctors are still working to reduce medical errors and better protect patient safety.

18.    AHRQ has explained that misdiagnoses "disproportionately affect vulnerable populations" across demographic categories, including gender, "and add to inequities in health outcomes."[3]

19.    According to AHRQ, diagnostic error is not only "a significant and underrecognized threat to patient safety," but also a "significant economic burden on the U.S. healthcare system."[4]

20.    To decrease the occurrence of medical errors and better protect patient safety, hospitals developed a tradition of openly discussing complications of care and medical errors in a

---

[1] *Glossary*, AHRQ, https://perma.cc/8FNZ-9R4U.

[2] *Id.* ("Adverse Event").

[3] AHRQ, *Diagnostic Safety Research at the Agency for Healthcare Research and Quality* 1, https://www.ahrq.gov/sites/default/files/wysiwyg/diagnostic/DiagnosticSafety-flier.pdf (last visited Mar. 11, 2025).

[4] *Id.*

forum known as a morbidity and mortality ("M&M") conference in the early twentieth century.[5] M&M conferences (or "rounds") enable practitioners to openly discuss mistakes and lessons learned.

21.     In November 1999, the U.S. Institute of Medicine released a landmark report titled *To Err Is Human*, which initiated a new paradigm of patient safety research. The report suggested that, at the time, as many as 98,000 deaths per year—two to four percent of all deaths in the United States—were caused by medical errors.

22.     *To Err Is Human* highlighted the limitations of traditional M&M conferences, including their low frequency and limited reach, the lack of specialty-specific conferences, and insufficient participation by nurses and nonphysician providers. Many providers were also reluctant to report their errors, fearing reputational, professional, and legal consequences. These limitations contributed to the frequent failure of traditional M&M conferences to identify and correct mistakes across an increasingly complicated healthcare system.

23.     In the late 1990s and early 2000s, AHRQ recognized an opportunity to better protect patient safety and prevent medical errors by creating an online forum that would couple the best practices of local M&M conferences with a national reporting system to facilitate open discussion of patient safety.

**B.     WebM&M and PSNet**

24.     In February 2003, AHRQ launched "Morbidity and Mortality Rounds on the Web" ("WebM&M") to offer a national, internet-based forum for M&M conversations. WebM&M quickly developed into an accessible resource for practitioners around the country to learn from

---

[5] Marit S de Vos et al., *The Morbidity and Mortality Conference: A Century-Old Practice with Ongoing Potential for Future Improvement*, 33 Eur. J. Pediatr. Surg. 114 (2023), available at https://perma.cc/7GMV-GY2L.

each other and to help improve the safety of their patients. It continues to be a national reporting system for medical errors.

25.    On WebM&M, healthcare providers anonymously submit de-identified medical error cases, and patient safety experts publish expert commentaries on a subset of those cases as part of WebM&M's "*Case Studies*" series. The purpose of the *Case Studies* series is to highlight important and emerging patient safety issues in order to educate practitioners, researchers, clinicians, consumers, and policymakers, and to guard against similar medical errors in the future.

26.    In April 2005, AHRQ launched the Patient Safety Network ("PSNet"), an online compendium of the latest research and resources on patient safety. The site provides articles, tools, and resources to facilitate future research efforts, influence hospital policies, and educate providers and patients about patient safety best practices.

27.    AHRQ's PSNet was an extension of WebM&M's effort to become the premier resource for materials relating to patient safety, and in September 2015, AHRQ merged WebM&M into PSNet, due to their shared focus on patient safety content. AHRQ's PSNet now hosts WebM&M's *Case Studies* series.

28.    AHRQ's PSNet aims to aid providers, educators, researchers, clinicians, consumers, and policymakers in efforts to prevent medical errors, design safer healthcare systems, teach principles of safety, and collaborate across disciplines and institutions.

29.    PSNet is the leading patient safety resource in the United States and one of the leading patient safety resources in the world for current patient safety topics. It is particularly valuable to researchers and those in the medical community because it offers a one-stop portal of resources for improving patient safety and preventing medical errors.

30.    All PSNet content is free and publicly available. Users can also create a PSNet account to customize the website around their unique needs and to receive alerts for personalized content matching their interests, enabling healthcare professionals to make better healthcare decisions.

31.    On information and belief, thousands of users visit PSNet each day. While current web traffic data for WebM&M and PSNet is not readily available, in August 2018, there were 27,766 PSNet accounts, and PSNet received an average of 3,494 visits per day.[6]

32.    AHRQ's PSNet is managed by an editorial team (the "Editorial Team"). The Editorial Team consists of nineteen editors and a librarian, each of whom work at either the University of California Davis or the American Institutes for Research. The Editorial Team works on a contractual basis with AHRQ to select content for various PSNet collections, including the *Case Studies* series, "Perspectives on Safety," "Patient Safety Innovations," "Patient Safety Primers," and a wide range of carefully annotated links to important research and other patient safety information.

33.    The current Editorial Team includes Dr. Patrick Romano, Dr. Deb Bakerjian, and Dr. Sarah Mossburg, who serve as the Co-Editors-in-Chief of PSNet and who, in addition to serving as contractors for AHRQ, are academics and researchers.

34.    The Editorial Team is tasked with ensuring that PSNet content is accurate, reliable, and relevant.

35.    The Editorial Team is advised by an Editorial Board and a Technical Expert Panel.

36.    The Editorial Board meets twice a year to provide general direction for the site, while day-to-day editorial decisions are the responsibility of the Editorial Team.

---

[6] *Government Response to Questions (PSNet)*, https://perma.cc/4P6C-KLKB.

37.    The Technical Expert Panel is comprised of fifteen academic experts in patient safety, healthcare quality, and clinical disciplines affiliated with universities and schools around the country.

38.    To submit a case for inclusion in the *Case Studies* series, healthcare providers fill out a form on AHRQ's PSNet. The form asks submitters to provide an appropriate case title; an anonymized patient description; a description of the nature of the medical error; a description of the impact of the error on the patient and whether the patient was harmed or required an increase in the level of care; a summary of how the error was recognized; and a brief recommendation for how providers or systems might prevent similar errors from happening in the future.[7]

39.    PSNet's Editorial Team reviews the submissions and selects cases to highlight and feature in AHRQ's WebM&M *Case Studies* series. The Editorial Team considers a number of criteria, which are publicly available, including:

- how interesting the case is clinically;
- how broadly applicable the case is from a medical error or patient safety standpoint;
- whether the case is an important example of a common error or raises key issues of general interest;
- whether the case has major educational value; and
- whether the case highlights important systems issues.[8]

40.    Common reasons the Editorial Team does not select cases for *Case Studies*, which are also publicly available, include:

- the case does not meet any of the criteria;
- the case violates patient or provider privacy;
- no error occurred, or it is unclear whether an error occurred;
- the incident is not related to patient safety;

[7] *Submit a Case*, PSNet, https://perma.cc/GRS9-U7G4 (last visited Mar. 11, 2025).

[8] *Selection Criteria and Honorarium Information*, PSNet, https://perma.cc/4KNG-JEEN (last visited Mar. 11, 2025).

- there is insufficient clinical detail to assess what happened or to identify opportunities for prevention or mitigation; and/or
- the subject matter or issue closely relate to a current case.[9]

41.    Once a case is selected for *Case Studies*, the Editorial Team typically invites an expert author or authors to submit a commentary based on the case.

42.    The Editorial Team draws a key distinction between content addressing patient safety—which is germane to PSNet—and content addressing healthcare quality in general—which is not.[10]

43.    AHRQ and HHS are adamant that hosted content is not to be understood as representing the agencies' own position. Contributions to PSNet, including those in *Case Studies*, contain a disclaimer: "Readers should not interpret any statement in this report as an official position of AHRQ or of the U.S. Department of Health and Human Services."

**C.    Dr. Schiff and Co-Authors Publish *Suicide Risk Assessment* on PSNet**

44.    As a primary care physician, one of Dr. Schiff's core responsibilities is making diagnoses. He has dedicated his career to improving his own ability to make diagnoses for his patients, as well as to educating the broader community of healthcare providers to prevent diagnostic errors and improve patient and medication safety.

45.    Dr. Schiff, working with co-authors, has published several dozen papers on PSNet over the years.

46.    In January 2017, Dr. Schiff was the Principal Investigator leading the team that established the Primary-Care Research in Diagnostic Errors ("PRIDE") Learning Network, a

---

[9] *Id.*

[10] Note that content that relates to both patient safety and healthcare quality is germane to PSNet and will be published.

group of patient safety organizations that study and work to improve diagnoses. The PRIDE Learning Network worked closely with the Betsy Lehman Center for Patient Safety, an agency of the Commonwealth of Massachusetts, to improve and educate on issues of diagnosis safety. Through the PRIDE Learning Network, Dr. Schiff and his team, working with partners at the Betsy Lehman Center, aimed to collect and share lessons from diagnostic error cases, conduct innovative research to improve primary care practice, and advance diagnostic strategies.

47.    Dr. Schiff and the PRIDE Learning Network have published nine cases in AHRQ's WebM&M *Case Studies* series.

48.    In September 2021, as part of the PRIDE Learning Network, Dr. Schiff and colleagues began work on a commentary of a case on suicide assessment and prevention. Their goal was to help healthcare providers deal with the unique challenges of identifying and managing patients who are at risk of suicide.

49.    On or around September 2, 2021**,** Dr. Schiff and co-authors submitted their case commentary of a near-miss suicide to AHRQ's *Case Studies* series.

50.    The Editorial Team of PSNet, working as government contractors for AHRQ, accepted the case commentary on suicide risk.

51.    Between September 2, 2021, and November 19, 2021, the co-authors produced nine drafts of the case commentary.

52.    The second draft, dated September 25, 2021, was the first to include the following language, citing the most widely circulated medical journal in the world, *The Journal of the American Medical Association*: "High risk groups include male sex, veterans, Indigenous tribes, Lesbian, gay, bisexual, transgender, queer/questioning (LGBTQ) as well as more obvious populations such as those with serious mental illness, prior suicide attempts, ideation/attempts,

alcohol or substance use, serious recent illness or emotional distress trauma or loss, history of recent trauma or loss."

53.     At no time in the editorial process did any of the government contractors on the Editorial Team—or any other AHRQ staff reviewing the drafts—suggest this language was scientifically inaccurate, not germane to the study or PSNet more broadly, or otherwise outside the bounds of PSNet's selection or publication criteria. Apart from separating this sentence into two, and adding the phrases "suicidal ideation" and "being young," the language went unchanged throughout the remainder of the editorial process.

54.     AHRQ staff also highlighted this language as a potential source for a recommendation to readers and practitioners. On November 17, 2021, a medical officer in AHRQ's Center for Quality Improvement and Patient Safety left a comment asking, "Is there a recommendation that these higher risk individuals be automatically screened?" In response, on November 24, 2021, Dr. Schiff inserted a sentence into the draft to note a recommendation that "all patients with behavioral health risk factors receive screening." AHRQ staff did not ask any further questions with respect to this language.

55.     On January 7, 2022, PSNet published the case study under the title, "Multiple Missed Opportunities for Suicide Risk Assessment" ("*Suicide Risk Assessment*").

56.     In a section of the final article considering tools to improve safety, the article includes the language: "High risk groups include male sex, being young, veterans, Indigenous tribes, lesbian, gay, bisexual, transgender, queer/questioning (LGBTQ)."

57.     At the bottom of the publication, a disclaimer states that the conclusions "do not necessarily represent the views of AHRQ" and advises readers not to "interpret any statement in

this report as an official position of AHRQ or of the U.S. Department of Health and Human Services."

**D.    Dr. Royce and Her Co-Author Publish *Endometriosis Commentary* on PSNet**

58.    As a staff physician, Dr. Royce's responsibilities include making diagnoses. Throughout her career, she has focused on improving her own ability to make diagnoses for her patients, as well as educating the broader community of healthcare providers to prevent diagnostic errors and improve patient safety. She also has a long-standing interest in helping doctors develop clinical reasoning and combat cognitive biases that lead to diagnostic error.

59.    In January 2020, Dr. Royce co-led a conference, hosted by the PRIDE Learning Network, on a case of a delayed diagnosis of endometriosis. Endometriosis is a condition where cells similar to the lining of the uterus grow outside the uterus. The condition can cause pain and lead to excessive bleeding and infertility.

60.    This case study conference brought together healthcare providers to discuss lessons learned from the initial misdiagnosis. Following the live case discussion, Dr. Royce was invited to write up her comments for AHRQ's WebM&M *Case Studies* series.

61.    Dr. Royce and a co-author wrote a commentary on the endometriosis case study, titled "Endometriosis: A Common and Commonly Missed and Delayed Diagnosis" ("*Endometriosis Commentary*"). Dr. Schiff provided editorial support for this commentary and communicated with the government contractors on PSNet's editorial board throughout the editorial process.

62.    *Endometriosis Commentary* examines the missed opportunities for a timely diagnosis in a particular patient's case and explains the challenges in diagnosing endometriosis. Dr. Royce and her co-author point out that, in the endometriosis case study, the initial (incorrect)

13

diagnosis of primary dysmenorrhea was given without considering endometriosis because the "gynecologist may have not considered endometriosis in such a young adolescent, as this patient did not 'fit' the more common presentation of an older adolescent or young adult."

63.    In a list of take-home points from *Endometriosis Commentary*, Dr. Royce and her co-author write, "it is important to note that endometriosis can occur in trans and non-gender-conforming people and lack of understanding this fact could make diagnosis in these populations even more challenging. Therefore, endometriosis should be considered in the differential diagnosis for any person presenting with chronic abdominal or pelvic pain."

64.    Working with Dr. Royce and her co-author as an editor, Dr. Schiff submitted the final draft of *Endometriosis Commentary* to PSNet on May 3, 2020.

65.    In response, on May 7, 2020, Dr. Bakerjian and Dr. Romano, working in their capacity as contractors for AHRQ, offered revisions and requested a resubmission. Specifically, they requested that the case commentary shift to include greater focus on the diagnostic process as opposed to treatment, more firmly situating the paper in PSNet's core patient safety context.

66.    Dr. Bakerjian and Dr. Romano offered several critiques and questions regarding specific excerpts from the *Endometriosis Commentary* draft by email, none of which mentioned the sentence regarding "trans and non-gender-conforming people."

67.    In response to these emails and in-text comments from Dr. Bakerjian and Dr. Romano, Dr. Royce revised the draft to more closely align with the patient safety focus of PSNet.

68.    On or about May 7, 2020, Dr. Royce and her co-author finalized the draft for publication.

69.    At no time in the editorial process did any of the government contractors or members of the Editorial Team—or any other AHRQ staff reviewing the drafts—suggest that

language noting that "endometriosis can occur in trans and non-gender-conforming people" was scientifically inaccurate, not germane to the commentary or PSNet more broadly, or otherwise outside the bounds of PSNet's selection or publication criteria.

70.     On June 24, 2020, PSNet published *Endometriosis Commentary*. At the bottom of the publication, a disclaimer states that the conclusions "do not necessarily represent the views of AHRQ" and advises readers not to "interpret any statement in this report as an official position of AHRQ or of the U.S. Department of Health and Human Services."

**E.     President Trump Issues Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"**

71.     On January 20, 2025, President Trump issued Executive Order 14168, titled, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO").[11]

72.     The Gender Ideology EO states that it is "the policy of the United States" to recognize only "two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." It defines "sex" as one's "immutable biological classification as either male or female"; "woman" and "girl" as "female" (i.e., "a person belonging, at conception, to the sex that produces the large reproductive cell"); and "man" and "boy" as "male" (i.e., "a person belonging, at conception, to the sex that produces the small reproductive cell").

73.     The Gender Ideology EO states that "deny[ing] the biological reality of sex . . . is wrong" and that "[t]he erasure of sex in language . . . has a corrosive impact not just on women but on the validity of the entire American system."

---

[11] Exec. Order No. 14168, 90 Fed. Reg. 8615, https://perma.cc/ZC84-KK6J.

74.    The EO directs agencies to combat what it deems to be "gender ideology" and the "false claim[s]" it permits, which it defines as follows:

> "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

75.    The Gender Ideology EO directs agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology" and to "cease issuing such statements, policies, regulations, forms, communications or other messages."

## F.    OPM Issues Implementing Guidance to Effectuate President Trump's Gender Ideology EO

76.    On January 29, 2025, Charles Ezell, the Acting Director of OPM, issued a memorandum to all department and agency heads titled "Initial Guidance Regarding President Trump's Executive Order *Defending Women*" ("OPM Memo").[12]

77.    The OPM Memo states that "[i]n light of [the Gender Ideology EO], each agency should take prompt actions to end all agency programs that use taxpayer money to promote or reflect gender ideology as defined in Section 2(f) of [the Gender Ideology EO]."

78.    The OPM Memo specifies that, "[n]o later than 5:00 p.m. EST on Friday, January 31, 2025," agency heads must "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology," among other actions.

---

[12] Memorandum from Charles Ezell, Acting Director, U.S. Off. Pers. Mgmt. to Heads & Acting Heads of Dep'ts & Agencies (Jan. 29, 2025), https://www.opm.gov/media/yvlh1r3i/opm-memo-initial-guidance-regarding-trump-executive-order-defending-women-1-29-2025-final.pdf.

79.    The OPM Memo further specifies that, "[n]o later than 5:00 p.m. EST on Friday, February 7, 2025," agency heads must "report to OPM on all steps taken to implement this guidance."

80.    The OPM Memo cites to 5 U.S.C. §§ 1103(a)(1) and (5) as grounds for OPM's authority to issue the directives in the Memo.

81.    Section 1103 of Title 5 of the U.S. Code is titled "Functions of the Director." Section 1103(a)(1) and (5) provide:

> (a) The following functions are vested in the Director of the Office of Personnel Management, and shall be performed by the Director, or subject to section 1104 of this title, by such employees of the Office as the Director designates:
>
>> (1) securing accuracy, uniformity, and justice in the functions of the office;
>>
>> . . .
>>
>> (5) executing, administering, and enforcing—
>>
>>> (A) the civil service rules and regulations of the President and the Office and the laws governing the civil service; and
>>>
>>> (B) the other activities of the Office including retirement and classification activities;
>>>
>>> except with respect to functions for which the Merit Systems Protection Board or the Special Counsel is primarily responsible . . . .

## G.    AHRQ Removes Plaintiffs' Articles from PSNet

82.    In accordance with the OPM Memo, AHRQ removed articles from PSNet that contain words or terms that "inculcate or promote" what the government deems to be "gender ideology."

83. On or before January 31, 2025, AHRQ removed *Suicide Risk Assessment* and *Endometriosis Commentary* from PSNet.

**1.    AHRQ Removes *Suicide Risk Assessment* from PSNet**

84. On January 31, 2025, the PSNet Editorial Team's co-editor in chief, Dr. Romano, emailed Dr. Schiff and his co-authors to inform them that *Suicide Risk Assessment* was "removed from the PSNet website due to a perception that it violates the White House policy on websites 'that inculcate or promote gender ideology.'" Dr. Romano attached the OPM Memo to his email.

85. Dr. Schiff forwarded Dr. Romano's January 31 email to "leaders here at Harvard and professional organizations of which I am a member," copying Dr. Romano.

86. The Editor-in-Chief of the *Bellevue Literary Review* was copied on Dr. Schiff's email, and she replied to the email to ask Dr. Romano about the removal process, asking "can you share with me how exactly this transpired? Who contacted you? What was the process? How did they find this case study?"

87. On February 1, 2025, Dr. Romano replied to this email, stating:

> Per this memo, AHRQ staff were given until 5pm ET Friday to "Take down all outward facing media (websites, social media accounts etc.) that promote or inculcate gender ideology." Based on guidance provided to AHRQ staff, this instruction from OPM was interpreted to include anything with the words "transgender," "nonbinary," or "gender identity." The phrase "LGBTQ" is problematic because it includes that letter T for "transgender."

Dr. Romano again attached the OPM Memo to his email.

88. In the same email, Dr. Romano stated that "AHRQ staff identified the relevant items (using ordinary search tools) and communicated directly with their web site contractor to pull them down." Dr. Romano also told the editor that "[w]e (content producers and editors) were informed after the materials had already been pulled down." Dr. Romano stated that "[t]he total

18

impact was to remove 2 Perspectives, 3 WebM&Ms (Cases, Commentaries, Spotlights), and ABOUT 15 shorter materials (e.g., brief summaries of published papers from journals indexed in PubMed)."

89.    Dr. Romano also confirmed that the language that triggered the removal of *Suicide Risk Assessment* is the following line: "High risk groups include male sex, veterans, Indigenous tribes, Lesbian, gay, bisexual, transgender, queer/questioning (LGBTQ)."

90.    On February 6, 2025, Dr. Romano emailed Dr. Schiff and his co-authors with an update on the removal of *Suicide Risk Assessment*. In that email, Dr. Romano identified the "problematic words" that triggered the removal of *Suicide Risk Assessment* as, "three words from a list of risk factors for suicide." Dr. Romano listed two of those problematic words as "transgender" and "LGBTQ."

### 2.    AHRQ Removes *Endometriosis Commentary* from PSNet

91.    On February 3, 2025, Dr. Romano emailed Dr. Royce, her co-author, and Dr. Schiff to inform them that *Endometriosis Commentary* was "removed from the PSNet website due to a perception that it violates the White House policy on websites 'that inculcate or promote gender ideology.'"

92.    On February 6, 2025, Dr. Romano emailed Dr. Royce and her co-author with an update on the removal of *Endometriosis Commentary*. In that email, Dr. Romano indicated that the language that triggered the removal of *Endometriosis Commentary* was the sentence that included the phrase, "it is important to note that endometriosis can occur in trans-and non-gender conforming people and lack of understanding this fact could make diagnosis in these populations even more challenging."

**H.    AHRQ Offers to Repost Plaintiffs' Articles on the Condition that Plaintiffs Remove Forbidden Terms**

93.    On February 6, 2025, Dr. Romano informed Dr. Schiff and his co-authors and Dr. Royce and her co-author by email that AHRQ could republish censored versions of their pieces on the "non-negotiable" condition of the "removal of the problematic words—i.e., the words 'transgender' and 'LGBTQ.'"

94.    Dr. Romano wrote, "In the case of [Dr. Schiff's] commentary, this entails simply editing out just three words from a list of risk factors for suicide."

95.    Dr. Romano wrote that, for Dr. Royce's commentary, "this entails editing out" the sentence including the phrase, "it is important to note that endometriosis can occur in trans . . ."

96.    Dr. Romano conveyed that, if they agreed to these changes, the authors could also include an editor's note indicating that the article was updated to comply with the Gender Ideology EO, but that the editor's note could not identify the specific words excised.

97.    Dr. Schiff rejected the option to republish a censored version of *Suicide Risk Assessment* that omitted "transgender" and "LGBTQ" from the list of high-risk groups because to do so would be factually inaccurate, unethical, and run contrary to the purpose of the article, which was to identify risk factors for suicide.

98.    On February 7, 2025, Dr. Royce indicated that she would approve reposting *Endometriosis Commentary* with the editor's note and with the last sentence revised to read, " . . . it is important to note endometriosis can occur in any woman and is a rare but possible diagnosis in men." Dr. Royce wrote she would not approve of deleting the sentence, "since the whole point of the piece is endo[metriosis] is frequently missed or delayed in diagnosis, and this sentence is encouraging readers to have an open mind."

99.    Dr. Romano responded later that day that Dr. Royce's alternate language had been rejected and reiterated that "the condition for restoration is non-negotiable."

100.    He stated, "It is the Administration's view that the terms men, man, male, etc., must only be used for persons who are biologically male (which they define as 'the sex that produces the small reproductive cell.')." He further stated that, "[t]herefore, in the Administration's view, endometriosis is not a possible diagnosis in men . . . ."

101.    On February 10, 2025, however, Dr. Romano emailed Dr. Royce and her co-author to report that Dr. Royce's proposal had been accepted. The revised language would read: "it is important to note that endometriosis can occur in any woman and is a rare but possible diagnosis in men."

102.    Nevertheless, two days later, Dr. Romano wrote Dr. Royce and her co-author again to say that the revised sentence was not accepted. He clarified that the only way to repost *Endometriosis Commentary* would be "to completely remove the . . . sentence." Dr. Romano reported what the editors were told: "To quote, 'we must not use any reference to transgender no matter how hidden we make it. We need to respect this decision and understand . . .'."

103.    Dr. Romano also informed Dr. Royce and her co-author that none of the other authors offered an option to republish a censored article chose to do so.

I.    **Impact of Government Censorship of PSNet**

104.    AHRQ's removal of Plaintiffs' articles from PSNet contradicts—and undermines—PSNet's stated mission of improving patient safety and is causing substantial harm to Plaintiffs.

105.    As of March 12, 2025, *Suicide Risk Assessment* and *Endometriosis Commentary* remain unavailable on PSNet. These resources are no longer available on the country's leading

patient safety resource and therefore cannot inform providers, researchers, clinicians, consumers, and policymakers, who are interested in the latest patient safety information regarding suicide prevention and the diagnosis of endometriosis.

106.    Because PSNet is a leading patient safety resource, having a publication on PSNet is an important professional accomplishment. It also makes an author's work widely available and for free, enabling experts to communicate to many members of the medical community and the public.

107.    Dr. Schiff includes *Suicide Risk Assessment* as a publication on his CV. If Defendants do not restore *Suicide Risk Assessment* to PSNet, Dr. Schiff may have to remove the publication from his CV or undertake the effort to republish the commentary somewhere less prestigious and update his CV accordingly. It is unclear where Dr. Schiff could republish his commentary even if he did undertake the effort to do so given the unique nature of AHRQ's WebM&M *Case Studies* series.

108.    The removal of *Suicide Risk Assessment* from PSNet could be professionally damaging, diminishing the number of publications on Dr. Schiff's CV. Dr. Schiff is currently being considered for a promotion from Associate to Full Professor, which would enhance his odds of being awarded grants—which are very competitive—and generally bolster his reputation in the academy. The volume of a candidate's academic scholarship is a factor taken into any application for promotion or tenure.

109.    Dr. Royce has likewise included *Endometriosis Commentary* as a publication on her CV. If Defendants do not restore *Endometriosis Commentary* to PSNet, Dr. Royce may have to remove the publication from her CV or undertake the effort to republish the commentary somewhere less prestigious and update her CV accordingly. It is unclear where Dr. Royce could

republish her commentary even if she did undertake the effort to do so given the unique nature of AHRQ's WebM&M *Case Studies* series.

110.    The removal of *Endometriosis Commentary* from PSNet could be professionally damaging, diminishing the number of publications on Dr. Royce's CV. Dr. Royce is currently being considered for a promotion from Assistant to Associate Professor, which carries with it increased compensation and reputation in the academic community. Academic scholarship is a factor taken into any application for promotion or tenure.

111.    Dr. Schiff and Dr. Royce are also concerned about the impact of the OPM Memo and AHRQ's implementation of that memo on their future academic scholarship. Both Dr. Schiff and Dr. Royce intend to submit papers to PSNet in the future and they both anticipate that future papers may contain ideas, messages, and/or terms forbidden by the OPM Memo and AHRQ's implementation of that memo. For example, future papers may similarly concern medical diagnoses for which a person's gender may be a relevant factor in promoting patient safety and avoiding medical error.

112.    At the same time, because Defendants have not made the full list of forbidden terms public and because what it means to "promote" what the government deems to be "gender ideology" is not clear, Dr. Schiff and Dr. Royce are also forced to guess as to the parameters of what research topics and specific words or terms are forbidden by the OPM Memo and AHRQ's implementation of that memo. Other research containing the terms identified in Dr. Schiff and Dr. Royce's articles as triggering removal (such as "LGBT") appears to remain available on PSNet.[13]

---

[13] *See, e.g.*, Christine Moutier, *Suicidal Ideation in the Family Medicine Clinic*, PSNet (Dec. 1, 2016), https://perma.cc/V2J2-KDUN.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution
### (Against All Defendants)

113.    Plaintiffs hereby reallege and adopt by reference all other allegations in this complaint.

114.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I.

115.    PSNet is a government forum for speech by private individuals.

116.    Defendants' removal of articles that may "inculcate or promote" what the government deems to be "gender ideology" violates Plaintiffs' First Amendment rights because it imposes a viewpoint-based restriction in a government forum.

117.    Defendants' removal of articles that may "inculcate or promote" what the government deems to be "gender ideology" further violates Plaintiffs' First Amendment rights because it is not reasonable in light of the purpose served by the forum.

118.    Defendants' violation of Plaintiffs' right to freedom of speech has caused, and will continue to cause, Plaintiffs to suffer undue and actual hardship and irreparable injury.

119.    Plaintiffs have no adequate remedy at law to correct the continuing deprivations of their constitutional liberties.

### SECOND CLAIM
### Violation of the Administrative Procedure Act—Arbitrary and Capricious
### (Against All Defendants)

120.    Plaintiffs hereby reallege and adopt by reference all other allegations in this complaint.

24

121.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

122.    The OPM Memo's direction to agencies to "[t]ake down all outward facing media . . . that inculcate or promote gender ideology" is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

123.    AHRQ's removal of articles from PSNet is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

124.    Defendants' actions are arbitrary and capricious. Defendants have failed to adequately justify their actions, have relied on factors Congress did not authorize them to consider, have failed to consider important aspects of the problem, and have failed to acknowledge or justify their change in position.

**THIRD CLAIM**
**Violation of the Administrative Procedure Act—Exceeds Statutory Authority**
**(Against OPM)**

125.    Plaintiffs hereby reallege and adopt by reference all other allegations in this complaint.

126.    The APA empowers this Court to "hold unlawful and set aside" agency action taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

127.    The OPM Memo's direction to agencies to "[t]ake down all outward facing media . . . that inculcate or promote gender ideology" is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

128.    OPM has no authority, by statute or otherwise, to require agencies to remove "outward facing media" that may "inculcate or promote" what the government deems to be "gender ideology."

129.    The statute that OPM identified as the source of its authority, 5 U.S.C. §§ 1103(a)(1) and (a)(5), does not authorize or delegate authority for OPM to require agencies to remove "outward facing media" that may "inculcate or promote" what the government deems to be "gender ideology."

130.    Because no statute authorizes OPM to require agencies to remove "outward facing media" that may "inculcate or promote" what the government deems to be "gender ideology," OPM's Memo directing agencies to do so exceeds its statutory authority.

## FOURTH CLAIM
### Violation of the Administrative Procedure Act—Contrary to Constitutional Right
### (Against All Defendants)

131.    Plaintiffs hereby reallege and adopt by reference all other allegations in this complaint.

132.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

133.    The OPM Memo's direction to agencies to "[t]ake down all outward facing media . . . that inculcate or promote gender ideology" is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

134.    AHRQ's removal of articles from PSNet is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

135.    For the reasons described in the First Claim for Relief, and incorporated here, Defendants acted contrary to the First Amendment to the U.S. Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1)      Declare that OPM Memo's direction to "[t]ake down all outward facing media . . . that inculcate or promote gender ideology," as applied to speech by private individuals and organizations on government-run forums, is unconstitutional and unlawful;

2)      Declare that AHRQ's implementation of the OPM Memo and/or Gender Ideology EO, by removing or altering speech by private individuals and organizations on government-run forums, is unconstitutional and unlawful;

3)      Vacate and set aside the OPM Memo's direction to "[t]ake down all outward facing media . . . that inculcate or promote gender ideology" and declare that the OPM Memo exceeds OPM's statutory authority and is arbitrary and capricious;

4)      Vacate and set aside AHRQ's actions, and any other actions by Defendants, their employees, agents, and successors in office and those in active concert or participation with them, to implement the OPM Memo and/or the Gender Ideology EO, by removing or altering speech by private individuals and organizations on government-run forums, and declare that those actions are arbitrary and capricious;

5)      Order AHRQ to restore to PSNet all articles, case studies, and other information removed after January 20, 2025, pursuant to the OPM Memo and/or the Gender Ideology EO;

6)      Preliminarily and permanently enjoin AHRQ, its employees, agents, and successors in office and those in active concert or participation with it, from implementing the OPM Memo and/or the Gender Ideology EO, by removing or altering speech by private individuals and organizations on government-run forums;

7)      Preliminarily and permanently enjoin AHRQ, its employees, agents, and successors in office and those in active concert or participation with it, from implementing the OPM Memo

27

and/or the Gender Ideology EO, by refusing to accept, publish, or highlight speech by private individuals and organizations on government-run forums, or otherwise burdening, restricting, or discriminating against such speech;

8)     Award Plaintiffs their costs, attorney's fees, and other disbursements for this action; and

9)     Grant any additional relief as the Court deems just and proper.

Dated: March 12, 2025                          Respectfully submitted,

*/s/ Jessie J. Rossman*
Jessie J. Rossman (BBO # 670685)
Rachel E. Davidson (BBO # 707084)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 801
Boston, MA 02018
617-482-3170
jrossman@aclum.org
rdavidson@aclum.org

Scarlet Kim*
Vera Eidelman*
Tyler Takemoto*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
scarletk@aclu.org
veidelman@aclu.org
ttakemoto@aclu.org

Ben Menke**
Bryce Morales**
Jessica Lin**
John Langford*
David Schulz*
MEDIA FREEDOM & INFORMATION ACCESS CLINIC
Abrams Institute
Yale Law School
P.O. Box 208215
New Haven, CT 06520-8215
ben.menke@ylsclinics.org
bryce.morales@ylsclinics.org
jessica.lin@ylsclinics.org
john.langford@ylsclinics.org
david.schulz@ylsclinics.org

*Pro hac vice* applications forthcoming
**Student practice applications forthcoming