**GORDON SCHIFF** and **CELESTE ROYCE**,

          *Plaintiffs*,

    v.

**U.S. OFFICE OF PERSONNEL MANAGEMENT**; **CHARLES EZELL**, in his official capacity as Acting Director of the U.S. Office of Personnel Management; **U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES**; **ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of Health and Human Services; **AGENCY FOR HEALTHCARE RESEARCH AND QUALITY**; and **MAMATHA PANCHOLI**, in her official capacity as Acting Director of the Agency for Healthcare Research and Quality,

          *Defendants*.

Case No. 25-cv-10595-LTS

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

*Leave to file excess pages granted on March 25, 2025, ECF 23.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

    A. AHRQ and PSNet ........................................................................................................ 2

    B. The Plaintiffs............................................................................................................... 4

    C. Plaintiffs Publish Patient Commentary on PSNet........................................................ 5

    D. Executive Order 14168: "Defending Women from Gender Ideology
       Extremism and Restoring Biological Truth to the Federal Government" ................... 6

    E. OPM's Guidance Regarding the Executive Order........................................................ 7

    F. AHRQ's Removal of Plaintiffs' Articles from PSNet.................................................... 7

        1. AHRQ's Removal of *Suicide Risk Assessment*................................................ 7

        2. AHRQ's Removal of *Endometriosis Commentary*.......................................... 8

        3. AHRQ's Offer to Repost Censored Versions of Plaintiffs' Articles ............... 9

    G. The Impact of Government Censorship on Plaintiffs and Patient Safety .................. 10

LEGAL STANDARD............................................................................................................... 11

ARGUMENT ......................................................................................................................... 12

    I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............................ 12

        A. Defendants' Implementation of the EO Violates the First Amendment......... 12

            1. PSNet Is a Limited Public Forum. ...................................................... 13

            2. Defendants Unlawfully Removed Plaintiffs' Commentary from
               PSNet for Viewpoint-Based Reasons. .................................................. 14

            3. Defendants' Implementation of the EO Draws Unreasonable
               Distinctions Given the Purpose of PSNet. .......................................... 17

        B. Defendants' Implementation of the EO Violates the APA............................. 20

            1. Defendants' Implementation of the EO Is Final Agency Action
               Subject to APA Review. ...................................................................... 20

2. Defendants' Implementation of the the EO Is Arbitrary and Capricious. ........................................................................................ 22

3. The OPM Takedown Directive Exceeds OPM's Statutory Authority. ..................................................................................... 25

II. ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM. ......................................................... 27

III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION. ........................................................................... 28

REQUEST FOR ORAL ARGUMENT ....................................................... 29

CONCLUSION ............................................................................................. 29

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO v. Off. of Pers. Mgmt.*,
  No. 25-01780, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025) ......................................... 26, 27

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) ............................................................................................................. 13

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................................ 20, 21

*California v. Bernhardt*,
  472 F. Supp. 3d 573 (N.D. Cal. 2020) .............................................................................. 23

*Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of L. v. Martinez*,
  561 U.S. 661 (2010) ............................................................................................................. 12

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ............................................................................................................. 28

*City of Providence v. Barr*,
  954 F.3d 23 (1st Cir. 2020) ................................................................................................. 25

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) ........................................................................................................ 12, 17

*Del Gallo v. Parent*,
  557 F.3d 58 (1st Cir. 2009) ................................................................................................. 17

*Dickson v. Sec'y of Def.*,
  68 F.3d 1396 (D.C. Cir. 1995) ............................................................................................ 23

*Dillmon v. Nat'l Transp. Safety Bd.*,
  588 F.3d 1085 (D.C. Cir. 2009) .......................................................................................... 22

*Drs. for Am. v. Off. of Pers. Mgmt.*,
  No. 25-322, 2025 WL 452707 (D.D.C. Feb. 11, 2025) ................................................ 21, 22

*Elrod v. Burns*,
  427 U.S. 347 (1976) ............................................................................................................. 27

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................................................................. 22

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................................................................. 21

*Hunt v. City of Los Angeles*,
638 F.3d 703 (9th Cir. 2011) ......................................................... 20

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) ......................................................................... 13

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ......................................................................... 25

Loper Bright Enterprises v. Raimondo,
603 U.S. 369 (2024) ......................................................................... 25

*Louisiana v. Biden*,
543 F. Supp. 3d 388 (W.D. La. 2021) ............................................. 23

*Massachusetts Fair Hous. Ctr. v. United States Dep't of Hous. & Urb. Dev.*,
496 F. Supp. 3d 600 (D. Mass. 2020) ............................................. 12

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018) ............................................................... 12, 19, 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................. 22, 23, 24

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) ................................. 19

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
No. 25-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ..................................... 25

*People for the Ethical Treatment of Animals v. Tabak*,
109 F.4th 627 (D.C. Cir. 2024) ................................................. 17, 18

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983) ........................................................................... 13

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) ......................................................................... 13

*Ridley v. Mass. Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004) ...................................................... passim

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ........................................................................... 27

*Rosenberger v. Rectors and Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ............................................................. 13, 14, 19

iv

*Santa Cruz Lesbian and Gay Community Center v. Trump*,
508 F. Supp. 3d 521 (N.D. Cal. 2020) ................................. 19

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947).................................................... 25

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
699 F.3d 1 (1st Cir. 2012)........................................ 11, 27

*Texas v. United States*,
524 F. Supp. 3d 598 (S.D. Tex. 2021) ............................ 23

*Trafalgar Cap. Assocs., Inc. v. Cuomo*,
159 F.3d 21 (1st Cir. 1998).................................... 21, 22

*United States v. Kokinda*,
497 U.S. 720 (1990).................................................. 18

*United States v. Miselis*,
972 F.3d 518 (4th Cir. 2020) ..................................... 19

*Worthley v. Sch. Comm. of Gloucester*,
652 F. Supp. 3d 204 (D. Mass. 2023) ........................... 28

**Statutes**

5 U.S.C. § 1101 .......................................................... 26

5 U.S.C. § 301 ........................................................... 26

5 U.S.C. § 704 ........................................................... 20

5 U.S.C. § 706 ....................................................... 22, 25

5 U.S.C. § 1103 .................................................. 25, 26, 27

Pub. L. No. 106-129, § 299, 113 Stat. 1653 (1999)................... 2

**Other Authorities**

Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025)............... passim

*Our Work*, U.S. Off. of Pers. Mgmt. (last visited Mar. 28, 2025) ............... 27

# INTRODUCTION

When the government creates a forum for private speech, it cannot engage in viewpoint-based discrimination. The First Amendment forbids such discrimination in all fora, but the necessity for the rule is perhaps most obvious in a case like this—where the speech at issue constitutes the scientific, medical views of experts tasked with identifying errors, indicators, and populations that others are most likely to overlook in their medical practice for the purpose of enhancing patient safety. Ignoring this constitutional prohibition, as well as the Administrative Procedure Act's directive that they engage in reasoned decision-making and not exceed the bounds of their statutory authority, Defendants have prohibited anything that "promotes" what the government deems to be "gender ideology" on a government-run forum for private speech that is the country's leading resource regarding patient safety and medical errors. Allowing the government to suppress medical research by doctors because it disfavors certain viewpoints undermines academic freedom, scientific advancement, and the health of countless individuals.

Congress created the Agency for Healthcare Research and Quality ("AHRQ"), which runs Patient Safety Network ("PSNet"), to enhance the quality of our nation's healthcare by developing and disseminating scientific research. PSNet is central to AHRQ's mission of improving patient safety. Yet, in response to Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," and implementing guidance from the Office of Personnel Management, AHRQ scrubbed that forum of research containing newly forbidden terms—including "LGBTQ" and "transgender"—because the government associates them with viewpoints it now disfavors.

Plaintiffs Dr. Gordon Schiff and Dr. Celeste Royce are physicians and Harvard Medical School professors whose work has focused on identifying medical errors and improving patient safety. Dr. Schiff authored an article published on PSNet on dealing with the unique challenges of

identifying and managing patients at risk of suicide. Dr. Royce authored a piece published on PSNet addressing the challenges of diagnosing endometriosis, which frequently causes severe pelvic pain. Both articles mentioned LGBTQ and transgender individuals in recommending diagnostic approaches. Solely because of those references, AHRQ has now deleted Plaintiffs' articles and refuses to re-publish them unless Dr. Schiff and Dr. Royce remove the forbidden language.

Plaintiffs seek a preliminary injunction to enjoin Defendants' ongoing restrictions on Plaintiffs' speech because they are (1) viewpoint-based and unreasonable in violation of the First Amendment; and (2) arbitrary and capricious, in excess of OPM's statutory authority, and contravene a constitutional right in violation of the Administrative Procedure Act.

## BACKGROUND

### A.     AHRQ and PSNet

Congress created AHRQ, which sits in the U.S. Department for Health and Human Services ("HHS"), in 1999 to protect patient safety and improve healthcare quality. Pub. L. No. 106-129, § 299, 113 Stat. 1653 (1999) (codified at 42 U.S.C. § 299 *et seq*). Patient safety is a cornerstone of medicine and improving it is core to AHRQ's mission. Langford Decl. ¶ 2 & Ex. 1. The ability of physicians to protect patient safety depends on their ability to identify, discuss, and learn from medical errors, including missed and delayed diagnoses. *Id*. ¶ 3 & Ex. 2; Schiff Decl. ¶¶ 16, 53; Royce Decl. ¶¶ 16, 46. As the leading federal agency on patient safety research, AHRQ views diagnostic errors as a "significant and underrecognized threat to patient safety," contributing to "avoidable suffering and preventable deaths." Langford Decl. ¶ 4 & Ex. 3.

Early on, AHRQ recognized that the internet could powerfully enhance practices to learn from diagnostic errors. In the twentieth century, physicians developed a tradition of in-person morbidity and mortality ("M&M") conferences, at which they discussed medical errors and lessons

learned. *Id*. ¶ 5 & Ex. 4. In 2003, AHRQ launched "Morbidity and Mortality Rounds on the Web" ("WebM&M") to function as an online, nationwide, ongoing M&M conference. *Id.* WebM&M consists primarily of the *Case Studies* series, which was designed to discuss and prevent diagnostic errors. *Id*. ¶ 6 & Ex. 5.

In 2005, AHRQ launched the Patient Safety Network ("PSNet"), which is now the leading forum for patient safety resources in the United States. *Id*. ¶ 7 & Ex. 6. Thousands of practitioners visit PSNet, which has approximately 3.3 million page views annually. *Id*. ¶ 8 & Ex. 7. In 2015, AHRQ merged WebM&M, including its *Case Studies* series, into PSNet due to their shared focus on patient safety content. *Id*. ¶ 10 & Ex. 9. PSNet is managed by editors who work as contractors for AHRQ (the "Editorial Team"). *Id*. ¶ 11 & Ex. 10. The Editorial Team oversees the *Case Studies* series, *id.,* which features cases of medical error paired with commentary from patient safety experts examining how the mistake occurred and recommending how to avert similar error in the future.

To submit a case to AHRQ's *Case Studies* series, practitioners fill out a form on PSNet, which asks for information about the medical error, including a description of the error, its impact on the patient, and a recommendation for preventing similar errors. *Id*. ¶ 12 & Ex. 11. The Editorial Team selects cases to include in the *Case Studies* series using criteria that it has made public, including how interesting a case is clinically and its educational value. *Id*. ¶ 13 & Ex. 12. Once it selects a case, the Editorial Team typically invites external experts to submit a commentary on the case. *Id*. ¶ 14 & Ex. 13. The Editorial Team's role is "to choose the most illustrative among [the cases] and then enlist the nation's (and often, the world's) top experts in safety to comment on them in a thoughtful, evidence-based, and engaging manner." *Id*. ¶ 15 & Ex. 14. Across PSNet,

the Editorial Team distinguishes between content about patient safety—which is germane to PSNet—and content about healthcare quality in general—which is not. *Id*. ¶ 13 & Ex. 12.

AHRQ and HHS are clear that expert commentary in the *Case Studies* series and across PSNet does not represent the agencies' own positions. *Id*. ¶ 16 & Ex. 15. Contributions to PSNet contain a disclaimer: "Readers should not interpret any statement in this report as an official position of AHRQ or of [HHS]." *Id*. It appears that AHRQ has never removed a published case and commentary before January 2025. Schiff Decl. ¶ 26.

### B. The Plaintiffs

Gordon Schiff, M.D., is an Associate Professor of Medicine at Harvard Medical School. *Id*. ¶ 3. He has practiced as a primary care physician since 1976 and continues to see patients at Brigham and Women's Hospital. *Id*. ¶¶ 5, 8. Throughout a career spanning four decades, Dr. Schiff has researched, taught, and written about patient safety, diagnosis error, and medication safety. *Id*. ¶¶ 3, 9–22 & Ex. 1. Dr. Schiff led the team that established the Primary-Care Research in Diagnostic Errors ("PRIDE") Learning Network, a group of patient safety organizations that study and work to improve diagnoses. *Id*. ¶ 15. Through the PRIDE Learning Network, Dr. Schiff and his team aim to collect and share lessons from diagnostic error cases and advance diagnostic strategies. *Id*. ¶ 16.

Celeste Royce, M.D., is an Assistant Professor of Obstetrics, Gynecology, and Reproductive Biology at Harvard Medical School. Royce Decl. ¶ 3. She has practiced as a staff physician since 1993 and works in the Department of Obstetrics and Gynecology at Beth Israel Deaconess Medical Center. *Id*. ¶ 5. Throughout her career, Dr. Royce has researched, taught, and written about general obstetrics and gynecology and about patient safety. *Id*. ¶¶ 10–12. One of Dr. Royce's areas of scholarly interest is the role of clinical reasoning in improving patient safety. *Id*. ¶ 10.

**Plaintiffs Publish Patient Commentary on PSNet**

      **1.**     **Dr. Schiff's *Suicide Risk Assessment* Commentary**

Dr. Schiff and the PRIDE Learning Network have published eight commentaries in the *Case Studies* series on PSNet. Schiff Decl. ¶¶ 16, 24. Among them was a commentary on a near-miss suicide, titled "Multiple Missed Opportunities for Suicide Risk Assessment" ("*Suicide Risk Assessment*"). *Id*. ¶ 27 & Ex. 2. In their commentary, Dr. Schiff and his co-authors highlighted the challenge of predicting imminent suicide. *Id*. ¶ 29 & Ex. 2. The authors emphasized that improving suicide prevention requires a multi-faceted approach, including better screening tools. *Id.*

The authors submitted an initial draft of *Suicide Risk Assessment* to PSNet's *Case Studies* series on or around September 2, 2021, and the Editorial Team accepted it. *Id*. ¶ 31. Between September 2, 2021, and November 19, 2021, the co-authors produced nine drafts of *Suicide Risk Assessment*. *Id*. ¶ 32. The second draft, dated September 25, 2021, added a sentence listing several groups at comparatively "high risk" for suicide. *Id*. ¶ 33 & Ex. 3. In the published article, the sentence reads, "High risk groups include male sex, being young, veterans, Indigenous tribes, lesbian, gay, bisexual, transgender, queer/questioning (LGBTQ)," supported by a citation to the world's most widely circulated medical journal. *Id*. ¶¶ 34, 39.

At no time in the editorial process did PSNet's Editorial Team—or any other AHRQ staff reviewing the drafts—suggest this language was scientifically inaccurate, not germane to the case study, or otherwise outside the bounds of PSNet's publication criteria. *Id*. ¶¶ 35–38 & Exs. 4–5.

On January 7, 2022, PSNet published *Suicide Risk Assessment*, including the sentence mentioning that transgender and LGBTQ individuals are at higher risk. *Id*. ¶¶ 27, 39 & Ex. 2. The commentary includes the usual disclaimer that its conclusions "do not necessarily represent the views of AHRQ" and that readers should not "interpret any statement in this report as an official position of AHRQ or of [HHS]." *Id*. ¶ 40 & Ex. 2.

## 2. Dr. Royce's *Endometriosis Commentary*

Dr. Royce and a co-author, with the editorial support of Dr. Schiff, sought to publish "Endometriosis: A Common and Commonly Missed and Delayed Diagnosis" ("*Endometriosis Commentary*") on PSNet's *Case Studies* series and submitted a first draft for consideration in May 2020. Royce Decl. ¶¶ 23-24. Endometriosis occurs when cells similar to the lining of the uterus grow outside of the uterus, which can cause pain and lead to excessive bleeding and infertility. *Id.* ¶ 21. In *Endometriosis Commentary*, Dr. Royce and her co-author note that the "lack of understanding" that "endometriosis can occur in trans and non-gender-conforming people" can make diagnosing endometriosis more difficult. *Id.* ¶ 24 & Ex. 3. Therefore, they suggest that "endometriosis should be considered in the differential diagnosis for any person presenting with chronic abdominal or pelvic pain." *Id.* ¶ 24 & Ex. 3. At no time in the editorial process did PSNet's Editorial Team—or any other AHRQ staff reviewing the drafts—suggest this language was scientifically inaccurate, not germane to the case study, or otherwise outside the bounds of PSNet's publication criteria. *Id.* ¶ 30.

On June 24, 2020, PSNet published *Endometriosis Commentary*, including the sentence regarding diagnosis for transgender and non-gender-conforming people. *Id.* ¶ 31 & Ex. 3. The commentary includes the usual disclaimer that its conclusions "do not necessarily represent the views of AHRQ" and that readers should not "interpret any statement in this report as an official position of AHRQ or of [HHS]." *Id.* ¶ 31 & Ex. 3.

## D. Executive Order 14168: "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"

On January 20, 2025, President Trump issued Executive Order 14168 (the "EO"), which directs all government agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate

gender ideology" and to "cease issuing such statements, policies, regulations, forms, communications or other messages." *See* 90 Fed. Reg. 8615, 8615–16 (Jan. 30, 2025). According to the EO, "gender ideology" is a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity." *Id.* at 8615. The EO declares this "wrong" and states that the Trump Administration "will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.*

### E.    OPM's Guidance Regarding the Executive Order

On January 29, 2025, Defendant Charles Ezell, the Acting Director of OPM, issued a memorandum to all agency heads titled "Initial Guidance Regarding President Trump's Executive Order Defending Women" ("OPM Memo"). Langford Decl. ¶ 18 & Ex. 17. Among other actions, the OPM Memo instructed agency heads to "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology" "[n]o later than 5:00 p.m. EST on Friday, January 31, 2025." *Id.* The Memo also demanded that agency heads "report to OPM on all steps taken to implement this guidance" by "5:00 p.m. EST on Friday, February 7, 2025." *Id.*

### F.    AHRQ's Removal of Plaintiffs' Articles from PSNet

### 1.    AHRQ's Removal of *Suicide Risk Assessment*

On January 31, 2025, PSNet co-editor-in-chief Dr. Patrick Romano emailed Dr. Schiff and his co-authors to inform them that *Suicide Risk Assessment* "had been removed from the PSNet website due to a perception that it violates the White House policy on websites 'that inculcate or promote gender ideology.'" Schiff Decl. ¶ 41 & Ex. 6. Dr. Romano attached the OPM Memo to his email. *Id*. ¶ 42 & Ex. 7.

Dr. Schiff forwarded this email to colleagues, copying Dr. Romano. *Id*. ¶ 43 & Ex. 6. Later that day, one of the recipients of the forwarded email replied to ask Dr. Romano, "can you share with me how exactly this transpired? Who contacted you? What was the process? How did they find this case study?" *Id*. ¶ 44 & Ex. 6. On February 1, 2025, Dr. Romano responded to explain that based on the OPM Memo—which he attached to the email—AHRQ staff had been provided guidance instructing them to remove any publication that included the words "transgender," "nonbinary," "gender identity," or "LGBTQ." *Id*. ¶ 45 & Ex. 6. He wrote, "AHRQ staff identified the relevant items (using ordinary search tools) and communicated directly with their web site contractor to pull them down." *Id.* He stated that 20 articles from PSNet had been removed. *Id.*

On February 6, 2025, Dr. Romano emailed Dr. Schiff and his co-authors with an update. *Id*. ¶ 46 & Ex. 8. In that email, Dr. Romano identified the "problematic words" that triggered the removal of *Suicide Risk Assessment* as "three words from a list of risk factors for suicide," including "transgender" and "LGBTQ." *Id.*

### 2. AHRQ's Removal of *Endometriosis Commentary*

On February 3, 2025, Dr. Romano emailed Dr. Royce, her co-author, and Dr. Schiff to inform them that *Endometriosis Commentary* was "removed from the PSNet website due to a perception that it violates the White House policy on websites 'that inculcate or promote gender ideology.'" Royce Decl. ¶ 35 & Ex. 6. On February 6, 2025, Dr. Romano emailed Dr. Royce and her co-author with an update, indicating that the "problematic words" were in the sentence stating that "it is important to note that endometriosis can occur in trans- and non-gender conforming people and lack of understanding this fact could make diagnosis in these populations even more challenging." *Id*. ¶ 36 & Ex. 7.

### 3. AHRQ's Offer to Repost Censored Versions of Plaintiffs' Articles

On February 6, 2025, Dr. Romano informed Dr. Schiff, Dr. Royce, and their respective co-authors that AHRQ could republish censored versions of their pieces on the "non-negotiable" condition of the "removal of the problematic words—i.e., the words 'transgender' and 'LGBTQ.'" Schiff Decl. ¶ 46 & Ex. 8; Royce Decl. ¶ 36 & Ex. 7. He added that the republished articles would have "a prominent editor's note" reading: "This article was updated on February 5, 2025 to comply with President Trump's Executive Order . . . ." Schiff Decl. ¶ 46 & Ex. 8; Royce Decl. ¶ 36 & Ex. 7. Dr. Romano told Plaintiffs he had to send "several of these email[s]," presumably to other authors of censored articles. Schiff Decl. ¶ 46 & Ex. 8; Royce Decl. ¶ 36 & Ex. 7.

Dr. Schiff rejected the offer because it "would be unethical" to adopt the government's preferred language. Schiff Decl. ¶ 47 & Ex. 8. He explained that "it would be irresponsible to falsely remove this as a risk factor when in fact it was, and censor truth out to be replaced by nontruth." *Id*. ¶ 47 & Ex. 8.

Dr. Royce expressed a similar commitment to retaining her now-forbidden view in *Endometriosis Commentary*. Royce Decl. ¶ 37 & Ex. 8. In a February 7th email, she indicated that she would only approve republication by changing the censored sentence to read: "it is important to note endometriosis can occur in any woman and is a rare but possible diagnosis in men." *Id*. She opposed "removing the sentence entirely, since . . . this sentence is encouraging readers to have an open mind." *Id*.

On February 7, Dr. Romano initially rejected Dr. Royce's alternate language, explaining that "the condition for restoration is non-negotiable." *Id*. ¶ 38 & Ex. 9. He stated, "It is the Administration's view that the terms men, man, male, etc., must only be used for persons who are biologically male (which they define as 'the sex that produces the small reproductive cell.'). Therefore, in the Administration's view, endometriosis is not a possible diagnosis in men . . . ."

*Id.* On February 10, however, Dr. Romano reversed course and informed Dr. Royce that her proposed revision had been accepted. *Id.* ¶ 39 & Ex. 10. But he reversed course again on February 12, and told Dr. Royce that her proposed revision was actually rejected, *Id.* ¶ 40 & Ex. 11. Dr. Romano quoted "AHRQ program staff," who explained that "'we must not use any reference to transgender no matter how hidden we make it. We need to respect this decision and understand . . . .'" *Id.* Dr. Romano stated, "we are back to the original 'deal' to completely remove the final sentence (which was deemed non-compliant with the President's Executive Order)." *Id.* He noted that "none of the four other authorship teams given similar deals has accepted it . . . since our counterproposals have been rejected." *Id.* Dr. Royce rejected the offer.

### G.     The Impact of Government Censorship on Plaintiffs and Patient Safety

The OPM Memo and AHRQ's removal of Plaintiffs' articles from PSNet hamper Plaintiffs' ability to protect patient safety, educate the medical community, and improve Plaintiffs' professional standing.

*Suicide Risk Assessment* and *Endometriosis Commentary* remain unavailable on PSNet. Langford Decl. ¶ 19. Because their articles are no longer available on the country's leading patient safety resource, Plaintiffs are unable to educate PSNet's broad audience on pressing patient safety information regarding suicide prevention and the diagnosis of endometriosis.

The government's censorship of Plaintiffs' articles also carries professional consequences. Because PSNet is a leading patient safety resource, publishing on PSNet is an important professional accomplishment. Schiff Decl. ¶ 50; Royce Decl. ¶ 42. Dr. Schiff and Dr. Royce both listed their respective commentaries on their CVs. Schiff Decl. ¶ 48 & Ex. 1; Royce Decl. ¶ 32. If Defendants do not restore the articles to PSNet, Plaintiffs will have to remove those publications from their CVs or seek to republish them somewhere less prestigious and update their CVs accordingly. Schiff Decl. ¶ 49; Royce Decl. ¶ 42. It is unclear where Plaintiffs could republish

their commentary, even if they undertake the effort to do so, given the unique nature of AHRQ's *Case Studies* series. Schiff Decl. ¶ 49; Royce Decl. ¶ 42. Further, both Plaintiffs are currently being considered for promotions, and academic scholarship bears critically on the selection process. Schiff Decl. ¶ 51; Royce Decl. ¶ 43. Plaintiffs' record of publication in well-regarded forums such as PSNet directly factors into their consideration for promotions. Schiff Decl. ¶ 51; Royce Decl. ¶ 44.

Plaintiffs are also concerned about the impact of the OPM Memo and AHRQ's implementation of that memo on their future academic scholarship. Both Dr. Schiff and Dr. Royce intend to submit papers to PSNet in the future and anticipate that future papers may contain ideas or terms forbidden by OPM and AHRQ. Schiff Decl. ¶ 52; Royce Decl. ¶ 45. For example, future papers may similarly concern medical diagnoses for which a person's gender may be a relevant factor in promoting patient safety and avoiding medical error. Schiff Decl. ¶ 52; Royce Decl. ¶ 45. This factor alone may function as a bar on Plaintiffs' being able to publish on PSNet. In addition, the parameters of what the government associates with "gender ideology" are unclear. Other research containing the terms identified in Plaintiffs' articles as triggering removal (such as "LGBT") appears to remain available on PSNet. Langford Decl. ¶ 20 & Ex. 18. Because the government has not publicized all its criteria for removing PSNet content, Plaintiffs can only speculate over the parameters of publishable research. Schiff Decl. ¶ 52; Royce Decl. ¶ 45.

## LEGAL STANDARD

To obtain a preliminary injunction, plaintiffs must show that weighing the following factors favor relief: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs and (4) the effect, if any, on the public interest." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012)

(internal quotation marks omitted). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Id.* The APA also authorizes courts to "postpone the effective date of an agency action or to preserve status or rights pending conclusion" of APA proceedings, "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Stays under the APA are governed by the same standard used to assess requests for preliminary injunctions. *See Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020).

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.   Defendants' Implementation of the EO Violates the First Amendment

The OPM Memo, as applied to private speech in government-run fora, and AHRQ's removal of such speech from PSNet violate the First Amendment because Defendants' actions amount to viewpoint-based and unreasonable restrictions of protected speech.

To analyze restrictions of private parties' expressive activity on government-controlled property, courts apply forum analysis. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). Under forum analysis, there are three categories of fora: traditional public fora, public fora created by government designation, and nonpublic or "limited public" fora. *Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010); *Cornelius*, 473 U.S. at 802; *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 (1st Cir. 2004).

Traditional public fora are "those places which by long tradition or by government fiat have been devoted to assembly and debate" such as public streets and parks. *Cornelius*, 473 U.S. at 802 (internal quotation marks omitted). Designated public fora arise when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that

purpose." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). "[A]ll remaining public property" are nonpublic fora, also known as limited public fora. *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–79 (1992); *see Ridley*, 390 F.3d at 76 n.4 (equating "nonpublic" and "limited-public" fora). Limited or nonpublic fora (hereinafter, "limited public fora") are fora that the government opens but "limit[s] to use by certain groups or dedicate[s] solely to the discussion of certain subjects." *Summum*, 555 U.S. at 470.

A forum may exist "more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable." *Rosenberger v. Rectors and Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995); *see id.* at 830–33 (forum analysis applies to university's student activity fund); *see also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46–48 (1983) (inter-school mail system); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678–84 (1998) (public broadcast station).

In limited public fora, the government may impose content-based restrictions, but "regulations are still unconstitutional under the First Amendment if the distinctions drawn are viewpoint based or if they are unreasonable in light of the purposes served by the forum." *Ridley*, 390 F.3d at 82.

### 1.    PSNet is a Limited Public Forum

AHRQ's PSNet website is a limited public forum. It is a government funded and operated communication channel that hosts private speech. All or nearly all of the *Case Studies* content is authored by private practitioners and researchers, not government employees. Schiff Decl. ¶ 25. While PSNet—like many limited public fora—is limited to a specific topic and the Editorial Team polices that line, the guidelines used before the recent politically motivated removals have all been tailored to accomplishing the goal of patient safety education, not filtering out messages or views the government does not like. Langford Decl. ¶ 12 & Ex. 11. And PSNet explicitly states that the

work contributed by nongovernmental authors does not reflect "official position[s] of AHRQ or of [HHS]." *Id*. ¶ 16 & Ex. 15.

**2.      Defendants Unlawfully Removed Plaintiffs' Commentary from PSNet for Viewpoint-Based Reasons**

Defendants removed Plaintiffs' commentaries from PSNet because they included terms the government associates with a viewpoint it disfavors, in violation of the First Amendment.

In all fora, viewpoint-based discrimination by the government is a "blatant" and "egregious" First Amendment violation. *Rosenberger*, 515 U.S. at 829. The government cannot "exercise viewpoint discrimination, even when the limited public forum is one of its own creation." *Id*. Viewpoint discrimination occurs when the government acts "in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." *Ridley*, 390 F.3d at 82. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829; *see Ridley*, 390 F.3d at 82.

The EO proscribes a specific "ideology"—as well as a set of "idea[s]" and "claim[s]" the government associates with it—because the government believes that ideology is "wrong," "unhealthy," "false," and "[e]xtrem[e]." 90 Fed. Reg. at 8615–16. Moreover, the EO prohibits statements that "promote or otherwise inculcate gender ideology," but not statements that oppose or criticize it. Equally, it does not ban statements that promote or inculcate the government's preferred view—i.e., statements promoting the ideas that there are only two sexes and that gender and sex are not distinct concepts. This prohibition is textbook viewpoint discrimination.

The OPM Memo implements and mirrors the EO's viewpoint discrimination. It directs agencies to suppress anything that "promote[s]" what the government deems to be "gender ideology" via the EO. Langford Decl. ¶ 18 & Ex. 17. Like the EO itself, the OPM Memo "prefers

one particular viewpoint in speech over other perspectives on the same topic." *Ridley*, 390 F.3d at 82. This plainly violates "[t]he bedrock principle of viewpoint neutrality." *Id.*

AHRQ's implementation of the OPM Memo is equally viewpoint-based, and further highlights the viewpoint-based nature of the Memo. AHRQ largely scrubbed PSNet of publications that use one or more words the government associates with "promoting" the now forbidden "gender ideology," including "LGBTQ" and "transgender." Schiff Decl. ¶ 45 & Ex. 6; Royce Decl. ¶ 36 & Ex. 7. AHRQ staff offered to republish the articles only on the condition that the publications remove the words the government associates with its disfavored viewpoint. Schiff Decl. ¶ 46 & Ex. 8; Royce Decl. ¶ 36 & Ex. 7. The government appears to take the position that the use of those words alone expresses the view that the government does not like, because it acknowledges the existence and humanity of transgender people.

Indeed, AHRQ made clear that the viewpoint behind those words was the problem: Even when Dr. Royce offered to rewrite the sentence that had triggered AHRQ's removal of *Endometriosis Commentary* by removing the verboten words ("trans" and "non-gender-conforming") and replacing them with a line stating that endometriosis is a "possible diagnosis in men," AHRQ refused because that sentence continued to communicate the verboten viewpoint. "It is the Administration's view that the terms men, man, male, etc., must only be used for persons who are biologically male (which they define as 'the sex that produces the small reproductive cell.'). Therefore, in the Administration's view, endometriosis is not a possible diagnosis in men . . . ." Royce Decl. ¶ 38 & Ex. 9. In addition, AHRQ staff explained that "we must not use any reference to transgender no matter how hidden we make it." *Id.* ¶ 40 & Ex. 11. There could be no clearer demonstration that, when it comes to the discussion of transgender patients on PSNet,

Defendants have acted "in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." *Ridley*, 390 F.3d at 82.

Defendants have not proffered—and cannot proffer—a viewpoint-neutral justification for excluding Plaintiffs' publications. Because the "government rarely flatly admits it is engaging in viewpoint discrimination," courts must often assess whether a government's restriction of speech otherwise germane to a forum can only be explained by a speaker's viewpoint. *Ridley*, 390 F.3d at 86. The Court need not do so here, given the clearly viewpoint-based nature of Defendants' removals. But even if it did engage in such an inquiry, it would be clear that there is no other explanation.

Prior to the removal of Plaintiffs' commentaries, no AHRQ staff suggested that Plaintiffs' publications were inaccurate or not germane to PSNet and its *Case Studies* series. Schiff Decl. ¶¶ 35–38 & Exs. 4–5; Royce Decl. ¶ 30. Rather, after the usual editorial process, PSNet published both articles, and the articles remained available on PSNet for approximately three and five years, respectively, before their recent removal. Schiff Decl. ¶ 27; Royce Decl. ¶ 34. AHRQ's offer to republish Plaintiffs' articles on the narrow and "non-negotiable" condition that Plaintiffs remove only a handful of specific words the government associates with its disfavored view proves that the articles are otherwise germane to PSNet. Schiff Decl. ¶ 46; Royce Decl. ¶¶ 38–39. Indeed, ARHQ's co-chief editor, Dr. Romano, acknowledged that the EO and OPM Memo resulted in the "censorship" of Plaintiffs' "factual and unbiased" content. Schiff Decl. ¶ 46 & Ex. 8; Royce Decl. ¶ 35 & Ex. 6. Plaintiffs' commentaries are currently excluded *solely* because the publications include words that communicate a message the government does not like. This viewpoint-based discrimination alone is sufficient for Plaintiffs to succeed on the merits of their claim.

### 3. Defendants' Implementation of the EO Draws Unreasonable Distinctions Given the Purpose of PSNet

Defendants' actions separately violate the First Amendment because the removal of Plaintiffs' articles pursuant to the EO and OPM Memo is unreasonable. Even when the government does not engage in viewpoint discrimination, restrictions of speech in a limited public forum must be "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806; *see also Ridley*, 390 F.3d at 90; *Del Gallo v. Parent*, 557 F.3d 58, 72–73 (1st Cir. 2009). Here, the removals are unreasonable for two reasons: (1) the removals directly contradict the purpose of PSNet as a forum, and (2) the government's policy is vague and invites arbitrary enforcement.

First, Defendants' actions are unreasonable because they contradict the patient-safety purpose of PSNet. To determine a forum's purpose, and whether regulations serve that purpose, courts look to the government's "stated purposes" in creating it. *Ridley*, 390 F.3d at 93. *People for the Ethical Treatment of Animals v. Tabak* is instructive on this point. 109 F.4th 627 (D.C. Cir. 2024). In *PETA,* the D.C. Circuit accepted the National Institute of Health's statement in its Comment Guidelines that the purpose of its social media accounts was to communicate important public health information and to engage the public on such issues for educational purposes. *Id.* at 633. And, in light of that purpose, the court held that NIH's practice of removing from its social media posts any comment that contained "the terms 'animal,' 'testing,' and 'cruel,'" was unreasonable. *Id.* at 630, 632. Because NIH social media posts often featured research involving animal experiments, NIH's policy "to consider words related to animal testing categorically 'off-topic' [did] not 'ring[ ] of common-sense.'" *Id.* at 636 (quoting *United States v. Kokinda*, 497 U.S.

720, 734 (1990)). Moreover, the policy was "inflexible and unresponsive to context," leading to the removal of entire long comments that happened to contain one banned word. *Id.* at 637–38.[1]

The same analysis demonstrates the unreasonableness of Defendants' regulations in this case. The purpose of AHRQ's *Case Studies* series is to "help the medical community and to prevent similar errors in the future." Langford Decl. ¶ 6 & Ex. 5. To realize that purpose, PSNet's Editorial Team selects content based on its salience to patient safety and educational potential. *Id.* ¶ 13 & Ex. 12. The government's censorship of content based on whether it "promotes" what the government deems to be "gender ideology" neither serves nor relates to the forum's purpose. Removing "factual and unbiased" content analyzing diagnostic errors and providing guidance on how to avoid those errors—like Plaintiffs' publications because they happen to contain a handful of words the government dislikes, Royce Decl. ¶ 35 & Ex. 6—runs contrary to the forum's purpose of educating the medical community and preventing similar errors in the future. Equally, even the directive to remove the words alone undermines the purpose of PSNet, which aims to identify things doctors may overlook when issuing diagnoses; removing any reference to gender and to transgender, non-binary, and gender-nonconforming people does the exact opposite. Forcing Plaintiffs to alter their commentary renders the advice less accurate and therefore less helpful to PSNet's goal of advancing patient safety and avoiding medical errors.

Second, Defendants' policy is unreasonable because it is so vague as to produce haphazard interpretations and threaten arbitrary enforcement. For a rule governing speech in a limited public forum to be reasonable, the government must "articulate some sensible basis for distinguishing

---

[1] For similar reasons, restrictions that, on their face, implausibly serve the government's purpose are unreasonable. In *Ridley*, the Massachusetts Bay Transportation Agency refused to host an advertisement describing smoking marijuana as "not cool" on the grounds that the message would induce teenagers to smoke marijuana; the First Circuit rejected that justification as unreasonable based on its facial implausibility. 390 F.3d at 89–90.

what may come in from what must stay out." *Mansky*, 585 U.S. at 16. In *Mansky*, the Supreme Court held that a Minnesota law banning "political" apparel in polling places was unworkable because its "use of the term 'political'" was "unmoored" from any discrete definition. *Id.* at 16–17. The law gave too much discretion to election judges whose "own politics" and "views on what counts as 'political'" portended "unfair or inconsistent enforcement." *Id.* at 22.

Defendants' policy here is similarly vague. The OPM Memo adopts the definition of "gender ideology" as stated in the EO, and likewise prohibits the "promot[ion]" and "inculcat[ion]" of "gender ideology." Langford Decl. ¶ 18 & Ex. 17. Neither the EO nor the Memo defines what it means to "promote" or "inculcate," and the definition of "gender ideology" in the EO does not actually delimit the bounds of that phrase, asserting only that it "permit[s] the false claim that males can identify as and thus become women and vice versa," and "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." *Id.*; 90 Fed. Reg. at 8615. Nor do the OPM Memo and EO reference any other law or regulation to offer guidance, and indeed no other law or doctrine define "gender ideology" or what it means to "promote" it.

The term "gender ideology" itself is vague because it is broad. *Cf. Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *19 (D. Md. Feb. 21, 2025) (holding that "equity"-related prohibition was vague in part because "equity" is "broad"). Moreover, "promote" and "inculcate" are expansive and highly subjective terms, and multiple courts have recognized that such terms are susceptible to a "wide range of meanings depending on context." *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020) (considering "encourage" and "promote"); *Rosenberger*, 515 U.S. at 836 (emphasizing "vast potential reach" of term "promote[]"); *Santa Cruz Lesbian and Gay Community Center v. Trump*, 508 F. Supp. 3d 521, 543–44 (N.D. Cal. 2020) (holding unconstitutionally vague an executive order that

contemplated conditioning federal grants on recipient's certification that they would not use funds to "promote" certain race- and sex-related concepts because it "lack[ed] clarity" and "pose[d] a danger of arbitrary and discriminatory application") (quoting *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011)).

The Defendants' incantation of "gender ideology" is so nebulous that it is impossible to imagine a "reasonable line" or "sensible basis" for enforcement. *Mansky*, 585 U.S. at 16. Indeed, AHRQ's own actions have demonstrated how the prohibition on content that inculcates or promotes "gender ideology" leads to "haphazard interpretations." *Id.* at 16–18. AHRQ removed Plaintiffs' articles for containing the terms "transgender" and "LGBTQ" but some articles that use these words still appear on PSNet. Langford Decl. ¶ 20 & Ex. 18. It is unclear why these articles, but not Plaintiffs', toe the line set by OPM and AHRQ. Defendants have thus engaged in arbitrary enforcement. *See Mansky*, 585 U.S. at 22.

## B. Defendants' Implementation of the EO Violates the APA

The OPM Memo's instruction that agency heads "[t]ake down all outward facing media . . . that inculcate or promote gender ideology" ("OPM takedown directive") and AHRQ's removal of articles from PSNet are final agency actions reviewable under the APA and are arbitrary and capricious. The OPM takedown directive also separately violates the APA for exceeding OPM's statutory authority.

### 1. Defendants' Implementation of the EO Is Final Agency Action Subject to APA Review

The APA authorizes courts to review "final agency action," 5 U.S.C. § 704, which is action that "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations . . . from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up). "The core question [for finality] is whether the agency has completed its

decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).

The OPM takedown directive marks the consummation of OPM's decisionmaking process with respect to implementing the EO's instruction that agencies "remove all statements . . . that promote or otherwise inculcate gender ideology." 90 Fed. Reg. at 8615–16. The OPM takedown directive gives a date and time certain—"5:00 p.m. EST on Friday, January 31, 2025"—by which agencies must "[t]ake down all outward facing media . . . that inculcate or promote gender ideology." Langford Decl. ¶ 18 & Ex. 17. It further orders agencies by another date and time certain—"5:00 p.m. EST on Friday, February 7, 2025"—to "report to OPM on all steps taken to implement this guidance, including: a complete list of actions taken in response to this guidance and [the EO]." *Id.* These orders are "definitive statement[s]" of OPM's "position" regarding compliance with the EO. *Trafalgar*, 159 F.3d at 35. There is nothing "merely tentative or interlocutory" about them. *Bennett*, 520 U.S. at 178.

AHRQ's removal of articles from PSNet is, in turn, the consummation of its "decisionmaking process to comply with the President's executive order, the OPM [takedown directive], or both." *Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25-322, 2025 WL 452707, at *5 (D.D.C. Feb. 11, 2025). On January 31, 2025, the date by which OPM required compliance, a PSNet co-editor in chief, who is an AHRQ contractor, informed Dr. Schiff that AHRQ had removed his article for violating "the White House policy on websites 'that inculcate or promote gender ideology'" and attached the OPM Memo. Schiff Decl. ¶ 41 & Ex. 6. When pressed, the contractor further detailed that "[p]er [the OPM] memo," AHRQ staff were instructed to '[t]ake down all outward facing media . . . that promote or inculcate gender ideology,'" which "was

interpreted to include anything with the words 'transgender,' 'nonbinary,' . . . 'gender identity,'" or "LGBTQ." *Id.* ¶ 45 & Ex. 6. Later, the contractor communicated to both Dr. Schiff and Dr. Royce that AHRQ could republish censored versions of their pieces on the "non-negotiable" condition of the "removal of the problematic words." *Id.* ¶ 46 & Ex. 8. "There is nothing in . . . [these] statement[s] that indicates the removals were discretionary or interlocutory." *Drs. for Am.*, 2025 WL 452707, at *6.

Both agencies' actions also have "direct and immediate consequences" for Plaintiffs, *Trafalgar*, 159 F.3d at 35, including the removal of their scholarship from PSNet, the country's leading patient safety resource; the resulting need to remove the publications from their CVs, with likely professional ramifications; and a chilling effect on their future scholarship. Schiff Decl. ¶¶ 52–54; Royce Decl. ¶¶ 43–45.

### 2. Defendants' Implementation of the EO Is Arbitrary and Capricious

The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that standard, "the agency must . . . articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). It cannot "rel[y] on factors which Congress has not intended it to consider," ignore "an important aspect of the problem," "offer[ ] an explanation . . . that runs counter to the evidence," or rely on an "implausible" explanation. *Id.* Nor can an agency "depart from agency precedent without explanation," *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1090 (D.C. Cir. 2009) (internal quotation marks omitted), or "*sub silentio*," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency must show "good reasons for the new policy." *Id.*

OPM and AHRQ's implementing actions are arbitrary and capricious because they mark a radical departure from longstanding precedent without *any* explanation by the agencies themselves, much less "a satisfactory" or "rational" one. *State Farm*, 463 U.S. at 43. The only explanation alluded to is an effort to comply with the EO, but that is not sufficient. "While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration"; "[t]he APA requires reasoning, deliberation, and process." *California v. Bernhardt*, 472 F. Supp. 3d 573, 600–01 (N.D. Cal. 2020). Accordingly, "[a] decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order." *Louisiana v. Biden*, 543 F. Supp. 3d 388, 414 (W.D. La. 2021), *vacated and remanded on other grounds*, 45 F.4th 841 (5th Cir. 2022); *see also Texas v. United States*, 524 F. Supp. 3d 598, 653–54 (S.D. Tex. 2021) (holding that a two-page Executive Order and a five-page Memorandum did not "demonstrate[] reasoned decisionmaking"); *cf. Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) ("When an agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision.").

Nor does the EO itself provide "a satisfactory explanation" for the agencies' actions. *State Farm*, 463 U.S. at 43. It makes allegations, but offers no support, much less "facts found," for them. *Id*. Therefore, the EO cannot possibly articulate any "rational connection between" those (non-existent) facts "and the choice made." *Id.* (citation omitted).

The EO further fails to provide any relevant explanation for the particular "choice made" by the agencies. It says nothing about the removal of private speech in a government forum, let alone private speech in a government forum focused on scientific or medical research. Moreover, that "choice" does not even conceivably further the EO's stated aim of "defend[ing] women's

rights and protect[ing] freedom of conscience." 90 Fed. Reg. at 8615. Medical research that promotes what the government deems to be "gender ideology" does not deny women any rights. To the contrary, Plaintiffs' research aims to improve the diagnosis of suicide risk and endometriosis, two conditions that profoundly impact millions of American women. Furthermore, requiring medical professionals to strip their scholarship of any reference to LGBTQ or transgender individuals is a quintessential *restriction* on their freedom of conscience, including with respect to how best to treat patients, teach students, and serve the broader medical community. *See, e.g.*, Schiff Decl. ¶¶ 52–56; Royce Decl. ¶ 47.

Defendants have also "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. PSNet is the country's leading patient safety resource, and its *Case Studies* series is a unique forum for medical professionals to highlight medical errors and discuss strategies for guarding against similar medical errors in the future. Schiff Decl. ¶¶ 50, 53, 55; Royce Decl. ¶ 42. The articles that AHRQ accepts for publication in PSNet are evidence-based, peer-reviewed, and selected because of their salience with respect to patient safety. Schiff Decl. ¶¶ 32, 48, 50; Royce Decl. ¶ 42. Defendants' actions have removed such research—for reasons unrelated to patient safety, making this scholarship unavailable to those who come to PSNet searching for the latest patient safety information. The actions therefore *undermine* PSNet's raison d'être—promoting patient safety.

Furthermore, Defendants' actions specifically undermine the safety of LGBTQ patients—individuals that may be particularly overlooked in diagnosis (as Plaintiffs' articles make clear). AHRQ itself has explained that misdiagnoses "disproportionately affect vulnerable populations" across demographic categories, including gender, "and add to inequities in health outcomes." Langford Decl. ¶ 4 & Ex. 3. And yet OPM's takedown directive and AHRQ's removal of articles

effectively erase from PSNet any scholarship that addresses patient safety when it comes to LGBTQ people. Plaintiffs and other authors whose scholarship contained forbidden terms, including the words "LGBTQ" and "transgender," were told AHRQ would remove their scholarship unless they sanitized their scholarship of the terms. Schiff Decl. ¶ 46 & Ex. 8; Royce Decl. ¶ 36 & Ex. 7. Either way, PSNet's medical literature no longer includes resources about diagnosing or addressing medical issues particularly affecting LGBTQ and transgender individuals.

### 3. The OPM Takedown Directive Exceeds OPM's Statutory Authority

The APA directs courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). "'[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). "If an agency exceeds that power, the court must set aside its action under the APA." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239, 2025 WL 597959, at *15 (D.D.C. Feb. 25, 2025) (citing 5 U.S.C. § 706(2)(C)).

Under *Loper Bright Enterprises v. Raimondo*, courts "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. 369, 412 (2024). And "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Here, OPM invokes 5 U.S.C. §§ 1103(a)(1) and (5) as the basis for issuing the takedown directive. But the plain text of these provisions does not authorize OPM to order other agencies to remove information from their websites. Subsection 1103(a)(1) authorizes the OPM Director to "secur[e] accuracy, uniformity, and justice in the functions of *the Office*." (emphasis added). Throughout Chapter 11 of Title 5, which governs OPM, including section 1103, "the Office" refers

only to "the Office of Personnel Management." *See, e.g.*, 5 U.S.C. § 1103(a) (vesting "Director of the Office of Personnel Management" with power of "appointing individuals to be employed by *the Office*" and "directing and supervising employees of *the Office*") (emphases added); *id.* § 1101 ("The Office of Personnel Management is an independent establishment in the executive branch. *The Office* shall have an official seal . . . .") (emphasis added). The authority to secure accuracy, uniformity, and justice in the functions of "the Office" therefore extends no further than OPM and cannot be the basis for any directives to other agencies.

Meanwhile, 5 U.S.C. § 1103(a)(5) authorizes the OPM Director to

execut[e], administer[ ], and enforc[e]—

(A) the civil service rules and regulations of the President and the Office and the laws governing the civil service; and

(B) the other activities of the Office including retirement and classification activities;

except with respect to functions for which the Merit Systems Protection Board or the Special Counsel is primarily responsible.

Neither (1) the laws, rules, and regulations governing the civil service nor (2) other activities of OPM are relevant here. The civil service rules—which concern the management of federal personnel—have no bearing on what other agencies publish on their websites. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Off. of Pers. Mgmt.*, No. 25-01780, 2025 WL 820782, at *5 (N.D. Cal. Mar. 14, 2025) ("Congress's statutory scheme grants to each agency head the authority to manage its own affairs . . . .") (citing 5 U.S.C. § 301; 5 U.S.C. § 301 ("The head of an Executive department . . . may prescribe regulations for the government of his department . . . and the custody, use, and preservation of its records, papers and property."). Nor do "the other activities

of" OPM, 5 U.S.C. § 1103(a)(5), the purpose of which is "workforce management for the federal government."[2]

American Federation of Government Employees, a recent case probing the bounds of OPM's statutory authority, is particularly instructive. There, federal employee unions challenged an OPM Memo, which directed *other* federal agencies to fire probationary employees, including on the ground that it exceeded OPM's statutory authority. The court held that "OPM did not have the authority to direct the firing of employees, probationary or otherwise, in any *other* federal agency." 2025 WL 820782, at *5. If OPM lacks authority to make firing decisions for other agencies, it certainly lacks authority to direct what information is to appear on other agencies' websites, a role completely divorced from human resources or personnel management. Accordingly, OPM lacked authority to issue the takedown directive.

## II.   ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM

Where "plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim," "[t]here is no need for an extensive analysis of this element of the preliminary injunction inquiry." *Fortuño*, 699 F.3d at 15. Instead, "it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well," *id.*, for "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Plaintiffs will be irreparably harmed absent a preliminary injunction against the OPM takedown directive and AHRQ's implementation

---

[2] *Our Work*, U.S. Off. of Pers. Mgmt., https://www.opm.gov/about-us/our-work (last visited Mar. 28, 2025) (describing OPM's "responsibilities" as to "set and enforce the background-check processes"; "provide human resources policies, services, and oversight to federal agencies"; and "develop and administer . . . employee benefits programs").

of that directive because their publications will continue to be unlawfully and unreasonably excluded from the country's leading patient safety resource based on their perceived viewpoint.

Absent relief, Plaintiffs may also suffer professional and attendant financial consequences. Both Plaintiffs are currently being considered for a promotion, and academic scholarship bears critically on their chances. Schiff Decl. ¶ 51; Royce Decl. ¶ 43–44. Having a publication on the country's leading patient safety resource is an important scholarly accomplishment. Schiff Decl. ¶¶ 50–51; Royce Decl. ¶ 42. Absent an injunction, Plaintiffs will be stripped of this accomplishment or forced to republish somewhere less prestigious and update their CVs accordingly. Schiff Decl. ¶ 49; Royce Decl. ¶ 42. Doing either would impact their standing in the academic community and could impact whether they are ultimately promoted. Schiff Decl. ¶¶ 50–51; Royce Decl. ¶ 44.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION

Both the balance of equities and the public interest weigh strongly in favor of preliminary injunctive relief. Courts in this circuit recognize that "[p]rotecting rights to free speech is *ipso facto* in the interest of the general public." *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 216 (D. Mass. 2023) (internal quotation marks omitted). That is so because unlawful government censorship "harms not only the speaker, but also the public to whom the speech would be directed." *Fortuño*, 699 F.3d at 15. It undercuts "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus," which is "a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). By censoring Plaintiffs' views on patient safety, the government has deprived "the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Id.* at 341.

An injunction here is especially important because Plaintiffs' speech is directed to the thousands of users who visit PSNet each day and who use the speech on PSNet to mitigate the odds of harm to patients. Both *Suicide Risk Assessment* and *Endometriosis Commentary* elucidate ways to prevent missed or delayed diagnoses of highly consequential yet common health conditions. Patients who struggle with suicidal ideation and/or endometriosis, along with their healthcare providers, have a clear interest in ensuring that these articles—along with PSNet content more broadly—remain accessible.

An injunction will not harm Defendants, who need only republish the censored content. To the contrary, Defendants' own interest in platforming "accurate, reliable, and relevant" expert opinions on PSNet regarding patient safety issues will be *furthered* if the challenged prohibition is enjoined. Langford Decl. ¶ 11 & Ex. 10.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs believe oral argument may assist the Court in resolving this motion and respectfully request oral argument.

## CONCLUSION

For the reasons above, Plaintiffs request that the Court grant their request for a preliminary injunction and order the relief requested in their proposed order.

Dated: April 1, 2025          Respectfully submitted,

/s/ Scarlet Kim
Scarlet Kim
Vera Eidelman
Tyler Takemoto
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
scarletk@aclu.org
veidelman@aclu.org
ttakemoto@aclu.org

Jessie J. Rossman (BBO # 670685)
Rachel E. Davidson (BBO # 707084)
Zoe Kreitenberg (BBO # 715356)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 801
Boston, MA 02018
617-482-3170
jrossman@aclum.org
rdavidson@aclum.org
zkreitenberg@aclum.org

Jessica Lin*
Bryce Morales*
Ben Menke*
John Langford
David Schulz
MEDIA FREEDOM & INFORMATION
    ACCESS CLINIC
Abrams Institute
Yale Law School
P.O. Box 208215
New Haven, CT 06520-8215
jessica.lin@ylsclinics.org
bryce.morales@ylsclinics.org
ben.menke@ylsclinics.org
john.langford@ylsclinics.org
david.schulz@ylsclinics.org

*Student practice applications pending

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(2)**

Although counsel for Defendants have not yet formally entered an appearance in this case, I, Scarlet Kim, hereby certify that in accordance with Local Rule 7.1(a)(2), Plaintiffs' counsel conferred with counsel who will be representing Defendants via email on March 31, 2025, and they indicated that Defendants oppose the motion.

*/s/ Scarlet Kim*
Scarlet Kim

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2025, a true copy of the foregoing will be electronically filed with the Clerk of Court using the Cm/ECF system, which will then send a notification of such filing (NEF).

*/s/ Scarlet Kim*
Scarlet Kim