# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

GORDON SCHIFF and,
CELESTE ROYCE,

                Plaintiffs,

v.

U.S. OFFICE OF PERSONNEL
MANAGEMENT,
CHARLES EZELL, in his official capacity as
Acting Director of the U.S. Office of
Personnel Management,
U.S. DEPARTMENT OF HEALTH &
HUMAN SERVICES,
ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services,
AGENCY FOR HEALTHCARE RESEARCH
AND QUALITY, and
MAMATHA S. PANCHOLI, in her official
capacity as Acting Director of the Agency for
Healthcare Research and Quality,

                Defendants.

Civil Action No. 1:25-CV-10595-LTS

Leave to file excess pages granted
on April 14, 2025, ECF 32.

# MEMORANDUM OF LAW IN OPPOSITION TO
# PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION ......................................................................................... 1

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    AHRQ and PSNet ......................................................................................................... 3

    Executive Order 14168 ................................................................................................ 4

    OPM and HHS Guidance Memos ................................................................................ 5

    Implementation at AHRQ and PSNet .......................................................................... 6

    The Present Lawsuit ..................................................................................................... 8

LEGAL STANDARD .......................................................................................................... 9

ARGUMENT ..................................................................................................................... 10

    I. The Court Lacks Subject Matter Jurisdiction ......................................................... 11

        A. Plaintiffs Lack Standing ...................................................................................... 11

        B. The Court Should Await the D.C. Court's Decision .............................................. 13

    II. Plaintiffs Fail To Show That A Preliminary Injunction Is Warranted ....................... 16

        A. No Showing of Irreparable Harm ......................................................................... 16

            Dr. Gordon Schiff .................................................................................................. 17

            Dr. Celeste Royce .................................................................................................. 19

        B. Plaintiffs Fail to Show High Likelihood of Success on the Merits ......................... 21

            1. First Amendment Claim ...................................................................................... 21

            2. Administrative Procedure Act Claims .................................................................. 24

                a. No "Final Agency Action" .............................................................................. 24

  b. Agency Actions Were Not Unreasonable ........................................... 25

  c. OPM Did Not Exceed Statutory Authority ........................................ 26

 C. The Balance of Equities Heavily Disfavors Plaintiffs ............................................ 26

 D. A Preliminary Injunction Is Not in the Public Interest ........................................... 27

CONCLUSION ..................................................................................................................... 28

## TABLE OF AUTHORITIES

## CASES

*Abbott Labs v. Gardner,*
   387 U.S. 136 (1967), *abrogated on other grounds by*
   *Califano v. Sanders*, 430 U.S. 99 (1977) ................................................................ 14

*Ass'n of Admin. L. Judges v. U.S. OPM,*
   640 F. Supp. 2d 66 (D.D.C. 2009) ...................................................................... 24, 25

*Atieh v. Riordan,*
   797 F.3d 135 (1st Cir. 2015) .................................................................................. 26

*Benjamin v. Aroostook Medical Center, Inc.,*
   57 F.3d 101 (1st Cir. 1995) .................................................................................... 11

*Bennett v. Spear,*
   520 U.S. 154 (1997) .............................................................................................. 25

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
   370 F.3d 151 (1st Cir. 2004) ............................................................................ 16, 20

*Christian Legal Society Chapter of the University of California Hastings College of Law v.*
   *Martinez,* 561 U.S. 661 (2010) ............................................................................... 21

*Craig v. Boren,*
   429 U.S. 190 (1976) .............................................................................................. 12

*D.H.L. Assocs., Inc. v. O'Gorman,*
   199 F.3d 50, 53-54 (Ist Cir. 1999) .................................................................... 14, 23

*Estiverne v. Louisiana State Bar Assn,*
   863 F.2d 371 (5th Cir. 1989) ................................................................................. 23

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ........................................................................................... 25-26

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
   460 F.3d 13 (D.C. Cir.2006) ................................................................................. 24

*Hazelwood School Dist. V. Kuhlmeier,*
   484 U.S. 260 (1988) .............................................................................................. 23

*Hearst Radio, Inc. v. FCC,*
   167 F.2d 225 (D.C. Cir.1948) ............................................................................... 24

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................... 11

*Mahoney v. Del Toro*,
    99 F.4th 25 (1st Cir. 2024) ............................................................................... 26

*Matos v. Clinton Sch. Dist.*,
    367 F.3d 68 (1st Cir. 2004) ............................................................................... 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................................. 25

*Munaf v. Geren*,
    553 U.S. 674 (2008) ............................................................................................. 9

*Perry Ed. Assn. v. Perry Local Educators' Assn.*,
    460 U.S. 37 (1983) ....................................................................................... 21, 23

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ........................................................................................... 21

*River St. Donuts, LLC v. Napolitano*,
    558 F.3d 111 (1st Cir. 2009) ............................................................................. 26

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    217 F.3d 8 (1st Cir. 2000) ................................................................................. 16

*Sindicato Pertorriqueno de Trabajadores v. Fortuno*,
    699 F.3d 1 (1st Cir. 2012) ........................................................................... 14, 20

*Soundboard Ass'n v. FTC*,
    888 F.3d 1261 (D.C. Cir. 2018) ......................................................................... 25

*Steffel v. Thompson*,
    415 U.S. 452 (1974) ........................................................................................... 11

*Sw. Airlines Co. v. U.S. Dep't of Transp.*,
    832 F.3d 270, 275 (D.C. Cir. 2016) ................................................................... 25

*United States v. AVX Corp.*,
    962 F.2d 108 (1st Cir. 1992) ............................................................................. 11

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State*,
    454 U.S. 464 (1982) ........................................................................................... 11

*Voice of the Arab World v. MDTV Medical News Now, Inc.*,
    645 F.3d 26 (1st Cir. 2011) ................................................................................. 9

*Vote Choice, Inc. v. DiStefano,*
    4 F.3d 26 (1st Cir.1993) ................................................................................ 11

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..................................................................................... 11

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ................................................................................. 9-10

*Wine & Spirits Retailers, Inc. v. Rhode Island (Wine & Spirits I),*
    418 F.3d 36 (1st Cir. 2005) ......................................................................... 12

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ....................................................................................... 10

## STATUTES AND REGULATION

5 U.S.C. § 551(13) ............................................................................................ 24

5 U.S.C. § 702 ................................................................................................... 24

5 U.S.C. § 704 ................................................................................................... 24

Executive Order 14168 ............................................................................. passim

## OTHER AUTHORITIES

11A Wright & Miller § 2948.1 at 139 ............................................................... 10

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

GORDON SCHIFF and,
CELESTE ROYCE,
          Plaintiffs,

v.

U.S. OFFICE OF PERSONNEL
MANAGEMENT,
CHARLES EZELL, in his official capacity as
Acting Director of the U.S. Office of
Personnel Management,
U.S. DEPARTMENT OF HEALTH &
HUMAN SERVICES,
ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services,
AGENCY FOR HEALTHCARE RESEARCH
AND QUALITY, and
MAMATHA S. PANCHOLI, in her official
capacity as Acting Director of the Agency for
Healthcare Research and Quality,

          Defendants.

Civil Action No. 1:25-CV-0595-LTS

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The undersigned counsel, on behalf of the United States and the above-captioned federal agencies and federal officials, in their official capacities, ("Defendants"), submits this Memorandum of Law in Opposition to the Plaintiffs' Motion for Preliminary Injunction.

## INTRODUCTION

In their Motion for Preliminary Injunction, Plaintiffs Dr. Schiff and Dr. Royce, both professors at Harvard Medical School, challenge the taking down of their respective articles from the website, PSNet, which was run by the Department of Health and Human Services ("HHS")'s Agency for Healthcare Research and Quality ("AHRQ"). Plaintiffs ask the Court to order

1

Defendants to restore to PSNet, all articles, case studies and other information removed pursuant to Executive Order 14168 and the OPM Memo implementing the same. They also ask this Court to order Defendants to not remove private speech by individuals and organizations on government-run forums; and to not allow Defendants to refuse to accept, publish, or highlight private speech on government-run forums or otherwise burdening, restricting, or discriminating against such speech.

This Court lacks subject matter jurisdiction over this matter. First, Plaintiffs lack standing as they purport to assert the rights of third parties in their bid for broad injunctive relief covering "private speech" by all "individuals and organizations" on all "government-run forums."

Plaintiffs can only assert their own rights, but even here, they lack standing as they are unable to show that the relief they request (the restoration of their articles to PSNet and requiring Defendants to accept their future submissions without regard to Executive Order 14168 and the OPM Memo), will address the injury they claim. PSNet stopped being an active website on March 24, 2025. As a practical matter, PSNet is unable to accept new content, including the restoration of Plaintiffs' articles or any new articles that the Plaintiffs may want to submit in the future.

Moreover, the nation-wide injunctive relief that Plaintiffs seek in this case is already being requested by plaintiffs in an earlier-filed case of *Doctors for America et al., v. OPM et al.*, 1:25-cv-00322-JDB, in the District of Columbia. The parties in the *Doctors for America* case have nearly completed all briefing on plaintiffs' motions for preliminary injunction and expedited summary judgment. This Court should exercise judicial restraint and await the D.C. district court's opinion in the *Doctors for America* case before proceeding with the instant case, in avoid the possibility of conflicting judicial directives.

Finally, Plaintiffs fail to show that the drastic remedy of a preliminary injunction is warranted here.  Notably, Plaintiffs fail to meet the critical prerequisite of showing that they will be irreparably harmed if a preliminary injunction is not granted.  They also do not show a high likelihood of success on the merits.   Further, the balance of equities and the public interest both weigh heavily against Plaintiffs.

## BACKGROUND

### AHRQ and PSNet

The Agency for Healthcare Research and Quality conducts health services research.  It is the nation's leading federal agency supporting patient safety research and supports state-of-the-art data analytics tools to analyze and improve the U.S. healthcare system.  (Declaration of Margie Shofer) ("Shofer Dec.") ¶ 3).  (Exhibit A).  The Center for Quality Improvement and Patient Safety is responsible for preventing, mitigating and reducing medical errors and patient harm.   (Shofer Dec. ¶ 3).

PSNet is a national web-based resource featuring news and resources on patient safety. (Shofer Dec. ¶ 3).  It is a website devoted to improving patient safety in the form of sharing original content developed by the contractor and content developed elsewhere such as peer reviewed journal articles and toolkits created outside of AHRQ.  (Shofer Dec. ¶ 3).   PSNet was launched in April 2005.  (Shofer Dec. ¶ 5).   As of September 2015, PSNet also hosted all previous AHRQ Morbidity and Mortality Rounds on the Web (WebM&M).   (Shofer Dec. ¶ 5).

On March 24, 2025, HHS's contract with PSNet expired and was not renewed. (Shofer Dec. ¶ 6).  PSNet is no longer an active website, and it is unable to accept any new content.  (Shofer Dec. ¶ 6).

Prior to March 24, 2025, when PSNet was still an active website, content on PSNet was

edited by a Technical Expert Panel team at the University of California, Davis; and American Institutes for Research, with technical support from a contractor, Pantheon.  (Shofer Dec. ¶ 7).

Also prior to March 24, 2025, when PSNet was still an active website, the contractor, Pantheon, was responsible for maintaining PSNet and curating the content for PSNet.  (Shofer Dec. ¶ 8).   Only the contractor could post content to PSNet.  (Shofer Dec. ¶ 8).   Members of the medical community who sought to post content onto PSNet were required to go through a vetting and editorial process with the PSNet Technical team and/or its selected outside subject matter experts.  (Shofer Dec. ¶ 8).

Prior to March 24, 2025, anyone could join PSNet.  (Shofer Dec. ¶ 9).   Having a PSNet account allowed users to select preferences for the content they were most interested in, and to track quizzes they took as part of web-based morbidity and mortality cases (which outline a patient safety error and discusses ways to prevent such an error in the future).   (Shofer Dec. ¶ 9).   However, users could never post opinions or any other content onto PSNet.  (Shofer Dec. ¶ 9).

### **Executive Order 14168**

On January 20, 2025, President Trump issued Executive Order 14168, entitled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*. Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("EO 14168") (Exhibit B).   This Order provides that "[i]t is the policy of the United States to recognize two sexes, male and female." *Id.* § 2. To ensure consistent implementation of this policy, the Order defines key terms, including "Sex" and "Gender ideology." *Id.* § 2(a), (f). These definitions "govern all Executive interpretation of and application of Federal law and administration policy." *Id.* § 2.

EO 14168 requires federal agencies to take various steps. *See id.* §§ 3-5, 7. Agencies

must use the Order's definitions "when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications." *Id.* § 3(b). In particular, "every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term 'sex' and not 'gender' in all applicable Federal policies and documents." *Id.* § 3(c). Further, "[a]gencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages." *Id.* § 3(e); *see id.* § 2(f) (defining "Gender ideology"). And they "shall promptly rescind all guidance documents inconsistent with the requirements of" the Executive Order, "or rescind such parts of such documents that are inconsistent in such manner." *Id.* § 7(c).

By May 20, 2025, "each agency head shall submit an update on implementation of [EO 14168] to the President." *Id.* § 7(a). The report "shall address . . . changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order." *Id.*

### OPM and HHS Guidance Memos

OPM and HHS—like every other federal agency—promptly began to implement the President's Executive Order. On January 29, 2025, the Acting Director of OPM sent a memorandum to fellow "Heads and Acting Heads of Departments and Agencies." (Exhibit C). The memorandum provided "initial guidance" about steps "agency heads should take" to "end all agency programs that use taxpayer money to

promote or reflect gender ideology as defined in Section 2(f)" of EO 14168. *Id.* at 1. For example, the OPM memorandum directed agencies to: "Take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology." *Id.* at 1. OPM said agencies "should take" these steps by January 31, 2025, and provide information about "actions taken in response to this guidance and [Executive Order 14168]" by February 7, 2025. *Id.* at 1-2.

On January 31, 2025, HHS, through the Acting Secretary, issued a Memo entitled: "Initial Guidance Regarding President Trump's Executive Order *Defending Women*." ("HHS Memo") (Exhibit D). The Memo stated that "All HHS Operating and Staff Divisions," were expected to comply with [EO 14168] and OPM guidance by taking prompt actions to end all agency programs that use taxpayer money to promote or reflect gender ideology as defined in Section 2(f) of" EO 14168. *Id.* at 1.

#### **Implementation at AHRQ and PSNet**

On January 31, 2025, Margie Shofer, the Division Director of General Patient Safety at AHRQ, received an email from the Director of AHRQ's Center for Quality Improvement and Patient Safety. (Shofer Dec. ¶ 10). The email attached a copy of the HHS Memo and the OPM Memo, and it also included a link to EO 14168. (Shofer Dec. ¶ 10).

On January 31, 2025, Nicole Shulman, from AHRQ's Office of Communication ("OC") sent an email to Ms. Shofer's team stating that given recent OPM guidance, OC was in the process of removing all web content that mentions gender and transgender topics. (Shofer Dec. ¶ 12). OC provided a preliminary list of links to content to be removed from PSNet. (Shofer Dec. ¶ 12). In an effort to comply with the OPM Memo, AHRQ's Office of Communications had run word searches through the articles in the PSNet database and

identified a list of articles that contained terminology that potentially conflicted with the EO and OPM Memo's directives.  (Shofer Dec. ¶ 12).

On January 31, 2025, Ms. Shofer narrowed the list of the articles Ms. Shulman identified to include only that content that was associated with the issues outlined in the Executive Order. (Shofer Dec. ¶ 13).

Later that day, on January 31, 2025, Ms. Shofer's team sent the narrowed list of articles to Kendall Hall, Vice President of Health at Pantheon, advising that those articles needed to be taken down from PSNet.   (Shofer Dec. ¶ 14).

Ms. Hall asked if it would be possible to come up with alternative content in the identified articles that would allow the articles to be republished on PSNet.   (Shofer Dec. ¶ 15).

Ms. Shofer agreed to try and explore the option of alternative content.   (Shofer Dec. ¶ 16). Over the next few days, Ms. Shofer worked with Ms. Hall to provide instructions and feedback to Dr. Patrick Romano, a subcontractor with Pantheon and also co-Editor in Chief of PSNet, regarding proposed modifications to the articles that had been identified.  (Shofer Dec. ¶ 16).

Dr. Romano reached out to Dr. Gordon Schiff regarding his article "Multiple Missed Opportunities for Suicide Risk Assessment" ("Suicide Risk Assessment article"); and to Dr. Celeste Royce regarding her article "Endometriosis: A Common and Commonly Missed and Delayed Diagnosis" ("Endometriosis article").  (Shofer Dec. ¶ 17).

With respect to the Suicide Risk Assessment article, Dr. Romano asked Dr. Schiff to eliminate the words "transgender" and "LGBTQ" from one sentence.  (Shofer Dec. ¶ 18).   Dr. Schiff declined.  (Shofer Dec. ¶ 18).

With respect to the Endometriosis article, Dr. Romano asked Dr. Royce to modify her sentence "endometriosis can occur in trans and non-gender-conforming people" to eliminate

reference to "trans" and "non-gender-conforming." (Shofer Dec. ¶ 19).  Dr. Royce proposed alternative language, namely: "it is important to note endometriosis can occur in any woman and is a rare but possible diagnosis in men." (Shofer Dec. ¶ 19).  Dr. Royce's proposed language ultimately was not accepted.  (Shofer Dec. ¶ 19).

Dr. Schiff's and Dr. Royce's commentaries were removed from PSNet on February 3, 2025.  (Shofer Dec. ¶ 20).

On February 12, 2025, AHRQ's Office of Communications asked Ms. Shofer to confirm that weblinks on PSNet with content not aligned with the Executive Order had been removed from PSNet, stating that the HHS Assistant Secretary for Public Affairs requested to know this information by that afternoon.  (Shofer Dec. ¶ 21).

On March 24, 2025, HHS's contract with Pantheon (under which Pantheon operated PSNet) ended and was not renewed.  (Shofer Dec. ¶ 22).

Because of the end of HHS's contract with Pantheon, PSNet is no longer being operated or updated.  (Shofer Dec. ¶ 23).  As of April 7, 2025, AHRQ's IT contractor is assessing their ability to host PSNet as a static website. (Shofer Dec. ¶ 23).  Currently, it is unclear if there will be the technical ability to post any new content on PSNet and tagging the content to make it searchable.  (Shofer Dec. ¶ 23).

Since March 24, 2025, and going forward, PSNet is a static website that is not accepting any new publications.  (Shofer Dec. ¶ 24).

By the same token, PSNet is unable to accept re-published articles such as the articles by Dr. Schiff and Dr. Royce.  (Shofer Dec. ¶ 25).

**<u>The Present Lawsuit</u>**

On March 12, 2025, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief,

alleging violation of the First Amendment and violations of the Administrative Procedure Act.

On April 1, 2025, Plaintiffs filed a Motion for Preliminary Injunction and a Memorandum of Law in Support of the Motion for Summary Judgment. (ECF No. 26) ("Pl. Memo"). Plaintiffs ask this Court to grant them preliminary injunctive relief ordering that Defendants be (1) enjoined from implementing the OPM Memo and/or Executive Order 14168 by removing private speech by individuals and organizations on government-run forums; (2) enjoined from implementing the OPM Memo and/or Executive Order 14168 by refusing to accept, publish, or highlight private speech on government-run forums or otherwise burdening, restricting, or discriminating against such speech; and (3) ordered to restore to PSNet all articles, case studies and other information removed pursuant to the OPM Memo and/or Executive Order 14168. (Proposed Order) (ECF Doc. 25-1, page 2).

## **LEGAL STANDARD**

"A preliminary injunction is an 'extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted), that "is never awarded as of right." Id. at 690; *Voice of the Arab World v. MDTV Medical News Now, Inc.* 645 F.3d 26, 32 (1st Cir. 2011).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tip in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

"The [Supreme] Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Thus, "[a]n injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against

injuries otherwise irremediable." *Weinberger*, 456 U.S. at 312. *See also* 11A Wright & Miller § 2948.1 at 139 (noting that "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.").

## ARGUMENT

Plaintiffs' motion for a preliminary injunction should be denied.

First, this Court lacks subject matter jurisdiction. Plaintiffs have no standing to request the broad injunctive relief that they seek, which purports to covers third parties; and where the relief, even if granted, would not address the injury they allege.

Moreover, the Court should exercise judicial restraint and decline to grant the preliminary injunction motion, as Plaintiffs' requests may soon become moot. In the earlier-filed case of *Doctors for America et al., v. OPM et al.*, 1:25-cv-00322-JDB, the federal district court for the District of Columbia is considering the preliminary injunction and summary judgment motions in that case which cover the same requested relief requested by Plaintiffs in the current case.

Finally, Plaintiffs in the present case have failed to show that they are likely to suffer irreparable harm before a decision on the merits can be rendered in the present case. Weighing this key prong, along with the other factors relevant for a preliminary injunction, notably the balance of equities, whether an injunction would be in the public interest, and the likelihood of success on the merits; the Court should deny the Motion for Preliminary Injunction.

## I.     The Court Lacks Subject Matter Jurisdiction

### A.  Plaintiffs Lack Standing

Plaintiffs lack standing to assert their requested relief in two respects.  First, they attempt to assert not only their own rights but those of third parties in that Plaintiffs ask this Court to enjoin Defendants with respect to all "private speech" by all "individuals and organizations" on all "government run forums" (ECF 25-1, page 2).   Second, they are unable to show that their alleged injury likely will be redressed by a favorable decision from this Court.

Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "If a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case." *United States v. AVX Corp*., 962 F.2d 108, 114 (1st Cir. 1992).   "The burden of alleging facts necessary to establish standing falls upon the party seeking to invoke the jurisdiction of the federal court."   *Benjamin v. Aroostook Medical Center, Inc*., 57 F.3d 101, 104 (1st Cir. 1995) (citing *Warth*, 422 U.S. at 501).

Federal courts are empowered only to decide "cases and controversies."   U.S. Const., Art. III.   A party who invokes a federal court's authority must show that: (1) he or she personally has suffered an "injury in fact" – an invasion of a legally protected interest that is concrete and particularized, and which is actual or imminent;  (2) the injury can fairly be traced to the challenged conduct of the defendant; and (3) the injury likely will be redressed by a favorable decision from the court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992);   *Valley Forge Christian Coll. v. Americans United for Separation of Church and State,* 454 U.S. 464, 471 (1982); *Vote Choice, Inc. v. DiStefano,* 4 F.3d 26, 36 (1st Cir.1993). The complaining party must satisfy this test throughout the litigation, not just at the moment when the complaint is

filed. *See Steffel v. Thompson*, 415 U.S. 452, 459 n. 10 (1974).

In the present case, Plaintiffs' Proposed Order to the Court seeks to enjoin the Defendants from implementing the OPM Memo and/or Executive Order 14168 in removing all "private speech" by all "individuals and organizations" on all "government-run forums." (ECF Doc. 25-1, page 2). Plaintiffs also seeks to enjoin the Defendants from implementing the OPM Memo and/or Executive Order 14168 in "refusing to accept, publish, or highlight private speech" or otherwise "burdening, restricting, or discriminating against such speech" on all government-run forums. *Id.* In addition, Plaintiffs ask that the Court order Defendants to restore to PSNet "all articles, case studies and other information removed pursuant to the OPM Memo and/or Executive Order 14168." *Id.*

However, the broad relief that Plaintiffs seek, which includes many third parties, should be rejected. "A party ordinarily has no standing to assert the First Amendment rights of third parties." *Wine & Spirits Retailers, Inc. v. Rhode Island (Wine & Spirits I)*, 418 F.3d 36, 49 (1st Cir. 2005). The exception to this rule, laid down in *Craig v. Boren*, 429 U.S. 190, 194-195 (1976), does not apply. That exception allows a litigant to raise a third party's rights only where (a) the third party has suffered a constitutional injury in fact, (b) the litigant enjoys a close relationship with the third party, and (c) obstacles exists to the third party assertion of his or her own rights. Here, Plaintiffs do not profess to have a close relationship with each of the "individuals and organizations" whom their proposed preliminary injunction order would affect. Nor is there any grounds to conclude that those "individuals and organizations" face obstacles to asserting their own rights.

Thus, at most Plaintiffs assert their own rights, that is challenging the removal of their respective articles from PSNet; asserting that their own articles should be reposted in their

original form; and demanding that any future submissions that Plaintiffs make to PSNet should be considered for publication without regard to EO14168 or the OPM Memo.

However, even here, Plaintiffs run into problems with standing.   They are unable to show the last prong of standing, namely that the injury they claim to have suffered will be redressed by the Court's grant of relief.   Even if the Court requires that PSNet re-post the Dr. Schiff's "Suicide Risk" article and Dr. Royce's "Endometriosis" article in their original forms; or requires that Plaintiffs' future submissions to PSNet not be subject to EO14168 or the OPM Memo, the practical obstacle is that PSNet is no longer being serviced.   The website has been static since March 24, 2025, and will remain so.   PSNet is unable to accept, and will not be accepting, any new content including the re-posting of earlier articles.

For these reasons, Plaintiffs have failed to show that they have standing to pursue the preliminary injunctive relief that they seek, and the Court should decline jurisdiction over this matter.

### B.  The Court Should Await the D.C. Court's Decision

The parties in the *Doctors for America* case pending before the federal district court of the District of the District of Columbia, have nearly completed all briefing on the plaintiffs' motion for preliminary injunction and expedited summary judgment as well as the defendants' cross-motion for summary judgment.   Plaintiffs in that case request injunctive relief that covers the relief requested in the current case.   Given that another federal district court is further along the process and likely to issue a decision soon, this Court should exercise judicial restraint and wait for the outcome of the *Doctors for America* case before proceeding to decide the preliminary injunction motion here.

In determining whether a case is ripe for judicial consideration, a court should

consider two factors: "The fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also* D.*H.L. Assocs., Inc. v. O'Gorman,* 199 F.3d 50, 53-54 (1st Cir. 1999). "The fitness of the issues for judicial resolution involves both constitutional and prudential components." *Sindicato Pertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012). As the First Circuit explained:

> "The constitutional inquiry, grounded in the prohibition against advisory opinions is one of timing." "Its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." "The prudential inquiry is 'whether resolution of the dispute should be postponed in the name of 'judicial restraint from unnecessary decision of constitutional issues' if elements of the case are uncertain, delay may see the dissipation of the legal dispute without need for decision.

*Id.* at 8. (citations omitted).

The complaint in the *Doctors for America* case, 1:25-cv-00322-JDB, ("DFA" case), which was filed on February 4, 2025, challenged the action of OPM in directing agencies to remove or modify webpages and datasets; and the removal by CDC, FDA and HHS of webpages and datasets. (DFA Case, ECF Doc. 1).[1] On February 6, 2025, the DFA Plaintiffs filed a Motion for a Temporary Restraining Order ("TRO"). (DFA Case, ECF Doc. 6). On February 11, 2025, Judge Bates granted the TRO and ordered HHS and the other defendants to restore to their original versions, the webpages and datasets that the Plaintiffs had identified in their brief. (DFA Case, ECF Doc. 11).

On February 18, 2025, the DFA plaintiffs filed an Amended Complaint in which they added AHRQ and other agencies as defendants to that action. (DFA Case, ECF Doc. 20).

---

[1] The original Complaint did not name AHRQ as a defendant.

14

On March 11, 2025, the DFA plaintiffs filed a Motion for Preliminary Injunction and Motion for Summary Judgment.  (DFA Case, ECF Doc. 20).  On March 24, 2025, the DFA defendants filed their opposition to the Motion for Preliminary Injunction and Motion for Summary Judgment, (DFA Case, ECF Doc. 27) and also filed a Cross-Motion for Summary Judgment.  (DFA Case, ECF Doc. 27).  The DFA plaintiffs filed their Reply in support of their motions (DFA Case, ECF Doc. 49), as well as their Opposition to the defendants' cross-motion, on April 3, 2025.  (DFA Case, ECF Doc. 50).  Judge Bates' scheduling order requires that the DFA defendants file any Reply by April 16, 2025.  (DFS Case, ECF Minute order of 4/8/25).

The DFA plaintiffs attached to their Motion for Preliminary Injunction and Summary Judgment, a Proposed Order which would among other things: (1) order the HHS Defendants to restore to the versions posted as of January 29, 2025, webpages and datasets that they removed or modified, or that they directed to have removed or modified, in response to the OPM memorandum;  and (2) enjoin the HHS Defendants from further enforcing a policy requiring removal of all outward facing media, including webpages and datasets, in whole or in part, that the agencies identify as promoting "gender ideology."  (DFA Case, ECF Doc. 37-2) (Exhibit E).

The DFA plaintiffs' requests for relief cover the requests for preliminary injunctive relief made by Plaintiffs in the present case in their proposed order (ECF Doc. 25-1, page 2).  The DFA plaintiffs even specifically called out Dr. Royce's article, "Endometriosis:  A Common and Commonly Missed and Delayed Diagnosis" as one of the webpages that was removed from the AHRQ website.  (DFA Case, Doc. 37-1, page 15).

This Court should exercise judicial restraint and allow Judge Bates of the District of Columbia District Court to make his decision on the DFA plaintiffs' Motion for Preliminary Injunction in that case, before proceeding here.   If plaintiffs in the *Doctors for America* case

are granted the relief they seek, that outcome could moot the present case.

If this Court were to issue a decision that is at odds with the decision of the D.C. Circuit when both courts are faced with the same issue (whether to grant injunctive relief and order previously removed articles to be restored to government agency websites including those run by AHRQ), this would entangle the courts in disagreements and leave the parties in a state of confusion on how to proceed.

Any hardship to the Plaintiffs in withholding court consideration until the D.C. district has issued its decision on the pending motions in the *Doctors for America* case, would be minimal.  Given that the motions will be fully briefed by April 16, 2025, it is unlikely that any wait will be significant.  Plaintiffs cannot show that they will suffer imminent harm in the interim.

For these reasons, the Court should exercise its discretion and refrain from proceeding with the present motion for preliminary injunction until the same request for relief in the *Doctors for America* case has been granted or denied.

## II.    PLAINTIFFS FAIL TO SHOW THAT A PRELIMINARY INJUNCTION IS WARRANTED

### A.  **No Showing of Irreparable Harm**

It is well established that "irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief." *Charlesbank Equity Fund II v. Blinds To Go, Inc*., 370 F.3d 151, 162 (1st Cir. 2004) (citing *Matos v. Clinton Sch. Dist*., 367 F.3d 68, 73 (1st Cir. 2004); *accord Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 217 F.3d 8, 13 (1st Cir. 2000) (describing irreparable harm as 'an essential prerequisite' for receiving such redress). "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely on the movant." *Charlesbank Equity Fund II* 370 F.3d at 162 (citation omitted).

Plaintiffs allege that absent preliminary injunctive relief, they "may" "suffer professional and attendant financial consequences." (Pl. Memo, page 28). They state:

> Both Plaintiffs are currently being considered for a promotion, and academic scholarship bears critically on their chances. Having a publication on the country's leading patient safety resource is an important scholarly accomplishment. Absent an injunction, Plaintiffs will be stripped of this accomplishment or forced to republish somewhere less prestigious and update their CV's accordingly. Doing either would impact their standing in the academic community and could impact whether they are ultimately promoted.

(Pl. Memo, Page 28) (citations to Declarations omitted).

The Court should reject Plaintiffs' claims that they will suffer irreparable harm in the form of being "forced" to republish their articles "somewhere less prestigious and update their CV's accordingly," which could "impact their standing in the academic community and could impact whether they are ultimately promoted" if the Court does not grant their preliminary injunction motion. Plaintiffs themselves acknowledge they "may" (not that they shall) suffer professional and attendant financial circumstances; and that not having these articles on PSNet "could" (not will) impact their chances for promotion.

Both Dr. Schiff and Dr. Royce have exceptionally impressive credentials and accomplishments. They cannot show that they will be irreparably harmed by each being "forced" to republish one of their numerous publications in a "less prestigious" publication than PsNet.

**Dr. Gordon Schiff**

Dr. Schiff is an Associate Professor of Medicine at Harvard Medical School, the Quality and Safety Director for the Center for Primary Care, a Course Director for the Master's Program in Quality, and a primary care physician at Brigham & Women's Hospital, where he is also the Associate Director of the Center for Patient Safety Research and Practice and Co-

Chair of the Ambulatory Morbidity and Mortality Primary Care Conference.  (Schiff Decl. ¶¶ 3, 5-6) (ECF Doc. 26-2, pages 1-2).

Dr. Schiff's CV is 85 pages long.   (Ex. 1 to Schiff Decl.) (ECF Doc. 26-2, pages 14-99). Dr. Schiff's CV lists 157 peer-reviewed publications, spanning 12 pages (ECF Doc. 26-2, pages 77-88.   In addition, Dr. Schiff lists 84 non-peer-reviewed publications (ECF Doc. Pages 88-94).   Furthermore, Dr. Schiff has many additional written accomplishments such as Professional educational materials, or reports; and Abstracts, Poster Presentations, and Exhibits Presented at Professional Meetings.   (ECF Doc. 26-2, pages 95-96).   On top of publications, Dr. Schiff's CV also lists numerous other significant and longstanding accomplishments such as Major Administrative Leadership Positions;   service on local, regional, national, and international committees;  Editorial Roles;  Honors and Prizes, work on Funded and Unfunded Projects;  Teaching and Training of students, Residents, Clinical Fellows, Research Fellows, and Peers;   Invited Presentations; Clinical Activities and Innovations;  Technological and Other Scientific Innovations;  Education of Patients and Service to the Community.  (ECF Doc. 26-2 pages 15-77).

In the context of Dr. Schiff's many publications and accomplishments, the taking down of one article, Dr. Schiff's "Suicide Risk" commentary, from PSNet, and the possibility that Dr. Schiff will be "forced" to publish this article in a "less prestigious" forum, is unlikely to affect his academic standing and/or his chances for promotion.   Further, Dr. Schiff has not alleged that there is any imminent event regarding his promotion that would require this Court to act on an expedited schedule in the form of a preliminary injunction.

In other words, Dr. Schiff cannot show that this Court needs to take the "extraordinary" and "drastic" step of accelerating the normal course of litigation to grant the

motion for preliminary injunction in order to prevent "irreparable" and "irremediable" harm from occurring to him.

**Dr. Celeste Royce**

Dr. Royce is an Assistant Professor at Harvard Medical School, where she is also the Vice Chair of the Clerkship Education Committee for the Department of Obstetrics, Gynecology and Reproductive Biology; and a practicing obstetrician- gynecologist physician at Beth Israel Deaconness Medical Center, where she is also the Director of Simulation and Director for Undergraduate Medical Education, serves on the Quality Assurance and Clinical Competency Committees for the Department of Obstetrics and Gynecology; and where she is also the Co-Director of the Rabkin Fellowship in Medical Education. (Royce Decl, ¶¶ 3, 5-7) (ECF Doc. 26-3, pages 1-2).

Dr. Royce's CV is 30 pages long. (Exhibit 1 to Royce Decl.) (ECF Doc. 26-3, pages 12-42). Dr. Royce lists 31 peer-reviewed articles in her CV. (ECF Doc. 26-3, pages 36-38). She also lists three non-peer reviewed articles, 15 publications under "Professional educational materials or reports," six Clinical Guidelines and Reports, and 14 Abstracts, Poster Presentations and Exhibits Presented at Professional Meetings. (ECF Doc. 26-3, pages 38-40). On top of publications, Dr. Royce's CV also lists numerous other significant and longstanding accomplishments such as Major Administrative Leadership Positions; service on local, regional, and national committees; Editorial Roles; Honors and Prizes, work on Funded and Unfunded Projects; Teaching and Training of students, Residents, Clinical Fellows, Research Fellows, and Peers; Invited Presentations; Clinical Activities and Innovations; Teaching and Education Innovations; Education of Patients and Service to the Community. (ECF Doc. 26-3 pages 13-36).

In the context of Dr. Royce's many publications and accomplishments, the taking down of one article, Dr. Royce's "Endometriosis" Commentary and the possibility that Dr. Royce will be "forced" to publish this article in a "less prestigious" forum, is unlikely to affect her academic standing and/or her chances for promotion.  Further, Dr. Royce has not alleged that there is any imminent event regarding her promotion that would require this Court to act on an expedited schedule for relief in the form of a preliminary injunction.

In other words, Dr. Royce cannot show that this Court needs to take the "extraordinary" and "drastic" step of accelerating the normal course of litigation to grant the motion for preliminary injunction in order to prevent "irreparable" and "irremediable" harm from occurring to her.

In assessing the claims of irreparable harm by both of the Plaintiffs, the First Circuit's case of *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004), is instructive.  There, in affirming the district court's denial of the plaintiff investors' motion for preliminary injunction, the First Circuit found that the plaintiffs had failed to carry the burden of showing irreparable harm, noting, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Id.* at 163.  "A preliminary injunction is potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests.  The instant record reflects no basis for a reasoned belief that such an order is necessary." *Id.*

Plaintiffs argue, however, that the irreparable injury component of the preliminary injunction analysis is already satisfied where "plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim."  (Pl. Memo, page 27) (quoting *Sindicato Pertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012).   However, *Fortuno* is

inapposite.  That case involved political speech that was subject to strict scrutiny review and where the court found a high likelihood of success on the merits of the First Amendment claim.  As set forth below, the present case poses an entirely different scenario involving a limited public forum subject only to a reasonableness review, where the Plaintiffs are unable to show a high likelihood of success.

B.  **Plaintiffs Fail to Show High Likelihood of Success on the Merits**

Plaintiffs fail to show a high likelihood of success on the merits of their First Amendment and APA claims.

### 1.  First Amendment Claim

As the Plaintiffs acknowledge, the PSNet website was a limited public forum, in that it was a government-run website that is limited to use by certain groups or dedicated solely to the discussion of certain subjects.  *See Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983).

In contrast to a traditional public forum where any restriction based on the content of speech must satisfy strict scrutiny (i.e., the restriction must be narrowly tailored to serve a compelling government interest); in a limited public forum, regulations need only be "reasonable and viewpoint neutral." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).  A policy or regulation that limits expression is deemed viewpoint neutral if it "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speaker or messages but not others." *Christian Legal Society Chapter of the University of California Hastings College of Law v. Martinez*, 561 U.S. 661, 679 n. 11 (2010).  Moreover, restrictions on access to a limited public forum "need not be the most reasonable or the only reasonable limitation." Id.

In the present case, the Defendants acted reasonably in their good faith attempts to comply with the President's EO and with the OPM Memo, while at the same time minimizing the impact to Plaintiffs' articles.    HHS components pulled down pages on their websites containing information that appeared inconsistent with Administration policy.    At AHRQ, additional efforts were made to try and maintain the identified articles on the PSNet website, but to make adjustments to limited words that could potentially run afoul of the EO and the OPM Memo.

Thus for Dr. Schiff's "Suicide Risk Assessment" article, which is 14 pages long, (ECF Doc. 26-2, pages 101-115), AHRQ asked only that two words, "transgender" and "LGBTQ" be eliminated in one sentence listing "High risk groups" (ECF Doc. 26-2, page 132),[2] after which it would be willing to repost the article, and AHRQ also would also be willing to add a disclaimer that the language had been deleted.  (ECF Doc. No. 26-2, pages 132-133).    Dr. Schiff declined this condition, and the article was removed from PSNet.

For Dr. Royce's "Endometriosis" article, which is 12 pages long, (ECF Doc. 26-3, pages 46-58), AHRQ asked that one sentence, "endometriosis can occur in trans and non-gender-conforming people" be modified to eliminate reference to "trans" and "non-gender-conforming." (Shofer Dec. ¶ 19).  When this, and other alternative language could not be agreed upon, the article was removed from PSNet.

The Defendants acted reasonably in that they were attempting to comply with the President's Executive Order and the OPM Memo.  The purpose of their editorial requests was not

---

[2] The listing of "High Risk" groups, in its original and unaltered form is available in other publications such as the article that Dr. Schiff cites, by Mann JJ, Apter A., Bertolote J., et al, entitled "Suicide prevention strategies: a systematic review" which is available on JAMA, a publication of the American Medical Association.  (ECF Doc. 26-2, page 112).

to target Plaintiffs' articles or to take anything away from the research they had conducted or the conclusions they had drawn in their respective articles, but to comply with the President's and OPM's orders.   At the same time, Defendants undertook steps to try and minimize the impact to Plaintiffs' articles.

Plaintiffs argue that such editorial edits are not viewpoint neutral.   However, the requirement of viewpoint neutrality is not absolute.  The Supreme Court has recognized that in a limited public forum, editorial control over the content of speech can be warranted.   Notably, in *Hazelwood School Dist. V. Kuhlmeier*, 484 U.S. 260 (1988), the Supreme Court held that educators at a public high school may exercise editorial control over the contents of a high school newspaper which was produced as part of the school's journalism curriculum, and which accepted funds from the Board of Education.  The Court noted that the school newspaper was not a "public forum" that was open to "indiscriminate use" but instead it was a forum "reserved its intended purpose" and thus school officials were entitled to regulate the contents of Spectrum in any reasonable manner. Id at 270.  *See also Estiverne v. Louisiana State Bar Assn*, 863 F.2d 371, 382-383 (5th Cir. 1989) (holding that a state bar journal that invited the public to submit articles and advertisements for consideration by the editorial board, had acted within the framework of editorial discretion necessary to fulfill the magazine's purposes and had not violated the First Amendment when it refused to publish an attorney's reply to the posts on his disciplinary proceedings).

Moreover, in the context of a limited public forum, the reasonableness of a given limitation may be gauged in part by the alternatives that remain available for exercising free speech.  See *Perry Educ. Assn.*, 460 U.S. at 53-54.  As both Dr. Schiff and Dr. Royce acknowledge, if their articles are not re-posted to PSNet, they have the option to republish their articles in other publications (including presumably those not run by or funded by the government, and thus not

subject to the President's EO or the OPM Memo).

Thus, Plaintiffs have not shown a high likelihood of success on their First Amendment claim.

### 2. Administrative Procedure Act Claims

Plaintiffs allege that the Defendants' implementation of EO 14168 and the OPM Memo in taking down their articles from PSNet (1) is "final agency action" subject to APA review, and (2) is arbitrary and capricious, and (3) exceeds OPM's statutory authority.   Plaintiffs fail to show a high likelihood of success with any of these claims.

#### a. No "Final Agency Action"

The APA "does not provide judicial review for everything done by an administrative agency." *Hearst Radio, Inc. v. FCC,* 167 F.2d 225, 227 (D.C. Cir.1948). Two "threshold questions" for every APA claim are "[w]hether there has been 'agency action'" and then "'final agency action' within the meaning of" 5 U.S.C. §§ 702 and 704.   *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir.2006). "[I]f these requirements are not met," the APA claim "is not reviewable." *Id.*

Here, Plaintiffs allege that the OPM Memo (which they term the "OPM takedown directive") is a final agency action.   However, Plaintiffs do not explain how the OPM Memo is an "agency action," under 5 U.S.C. § 551(13) (defining an "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof or failure to act.").    Instead, none of the categories of "agency action" fits the OPM Memo.   *See Ass'n of Admin. L. Judges v. U.S. OPM*, 640 F. Supp. 2d 66, 73 (D.D.C. 2009) (finding that "OPM's memo to agencies" was "not part of a rule, order, sanction or relief").

Also, OPM's guidance does not rise to the level of *final* agency action.   A final

agency action "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted). Agency action "must satisfy *both* prongs of the *Bennett* test to be considered final." *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (emphasis added).   Here, the OPM Memo was entitled "Initial Guidance."   Looking "at finality from [OPM's] perspective," the guidance did not "represent[]  the culmination of the agency's decisionmaking." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018) *see also Ass'n of Admin. L. Judges*, 640 F. Supp. 2d at 73 (OPM memo to agency heads "did not mark the consummation of a decision-making process").

Plaintiffs also argue that AHRQ's removal of articles from PSNet was also a "final agency action."  However, the articles were taken down because no agreement on alternative language could be reached at that time.   On February 3, 2025, the Plaintiffs' articles were not completely deleted from PSNet but instead put into an archive, to allow for the possibility of re-posting if future circumstances warranted.

### b.  Agency Actions Were Not Unreasonable

Plaintiffs do not show that OPM's and AHRQ's implementation of the EO was arbitrary and capricious.

The APA standard of review "is narrow," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "deferential," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and

reasonably explained the decision." *Id.*   Because this standard is "quite narrow: a reviewing

court 'may not substitute its judgment for that of the agency, even if it disagrees with the

agency's conclusions.' " *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (quoting *River St.*

*Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). Therefore, a reviewing court

must uphold an agency's decision if it is: (1) devoid of legal errors; and (2) "supported by any

rational review of the record." *Mahoney v. Del Toro*, 99 F.4th 25, 34 (1st Cir.

2024) (quoting *Atieh*, 797 F.3d at 138).

Here, both OPM and AHRQ acted within the bounds of reason.   OPM followed the

guidance of the EO and explicitly cited EO 14168 as the impetus for the guidance.  (OPM

Memo, page 1).  In turn, AHRQ was following the guidance of the HHS Memo, the OPM

Memo, and the EO.   Plaintiffs may disagree with the EO; but they cannot attack OPM's and

AHRQ's implementation of the EO, which was a rational result of the EO's directives.

### c.   OPM Did Not Exceed Statutory Authority

Plaintiffs argue that OPM's memorandum exceeded that agency's statutory

Authority.   However, OPM did not issue a "takedown directive" to other agencies.  (Pl. Memo

at 27).  Instead, OPM merely provided "initial guidance" about what "the President's Executive

Order" required of agencies. Those agencies, including HHS, then issued their own instructions

to employees to fulfill their independent obligations to comply with EO 14168.

### C.  **The Balance of Equities Heavily Disfavors Plaintiffs**

The balance of equities weighs heavily against the Plaintiffs.

Plaintiffs state that they will be irreparably harmed in terms of their careers, financial

prospects, and chances for promotion if their articles are not re-posted, in unaltered form, on

PSNet.   They note that absent such injunctive relief, they will be forced to submit their articles to

less prestigious publications and have to update their CV's.  As stated above, one less publication on the extensive CV's of Dr. Schiff and Dr. Royce is unlikely to damage the careers of either Plaintiff.

On the other hand, the cost to AHRQ of being forced to re-post the Plaintiffs' articles at this point is oppressive.  PSNet itself is no longer an active website and cannot accept new content, given that the contract to support PSNet expired and was not renewed.  The contractor, Pantheon, that used to operate and service PSNet, is out of the picture. AHRQ cannot immediately replace the resources that were lost due to the expiration of the PSNet support contract.  To require AHRQ's overburdened staff to set aside their other work in patient safety research to try and determine how to re-publish Plaintiffs' articles (not to mention "all articles" that were removed), and then to expend the time to do so and determine how to make those articles searchable to users, would be a severe drain on the limited resources of this agency.

In weighing the equities, the Court should deny Plaintiffs' request for a preliminary injunction.

### D.  **A Preliminary Injunction Is Not in the Public Interest**

Finally, it would not be in the public interest for this Court to grant the Plaintiffs' Motion for Preliminary Injunction.

What the Plaintiffs are requesting – the restoration to PSNet of all articles, case studies and other information removed pursuant to the OPM Memo and/or Executive Order 14168, is an onerous request which is likely impossible to fulfill given that PSNet's contract has expired, and AHRQ cannot immediately replace the resources once supplied by this contract.   It would not be in the public interest to require that AHRQ's overburdened employees set aside their patient safety work to try and undertake the work of restoring articles to PSNet.  The value to the public of having

these articles restored to PSNet at this point is also questionable.   PSNet is now a static website. Its future even as a static website is also in question.

Because PSNet is now a static website, the other portions of Plaintiffs' request for preliminary injunctive relief, enjoining Defendants from removing articles or refusing to accept new articles going forward, are moot.

## CONCLUSION

For the foregoing, reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: April 14, 2025                    By:      /s/ Shawna Yen
                                                  Shawna Yen
                                                  Assistant U.S. Attorney
                                                  U.S. Attorney's Office
                                                  1 Courthouse Way, Suite 9200
                                                  Boston, MA  02210
                                                  Tel.: 617-748-3100
                                                  Email: Shawna.Yen@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:  April 14, 2025                    By:      /s/ Shawna Yen
                                                  SHAWNA YEN
                                                  Assistant United States Attorney