UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GORDON SCHIFF and<br>CELESTE ROYCE,<br><br>    Plaintiffs,<br><br>v.<br><br>U.S. OFFICE OF PERSONNEL<br>MANAGEMENT et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil No. 25-10595-LTS<br>)<br>)<br>)<br>)<br>)<br>) |

ORDER ON MOTION FOR A PRELIMINARY INJUNCTION (DOC. NO. 25)

May 23, 2025

SOROKIN, J.

The plaintiffs in this action are physicians and professors who challenge the removal of articles they authored from an online patient-safety resource launched and hosted by the federal government. They allege violations of their First Amendment rights and the Administrative Procedure Act ("APA") arising from the implementation by three government agencies of an Executive Order concerning "gender ideology" signed by the President on January 20, 2025. Before the Court is the plaintiffs' motion for a preliminary injunction, Doc. No. 25, which is fully briefed and was the subject of a hearing. The plaintiffs are likely to succeed in proving that the removal of their articles was a textbook example of viewpoint discrimination by the defendants in violation of the First Amendment. Because irreparable harm necessarily flows from such a violation, and the balance of harms and the public interest favor the plaintiffs, the motion for a preliminary injunction is ALLOWED in part. As explained below, the defendants must restore the patient-safety articles they removed from the online resource at issue.

I.    BACKGROUND

A.    The Patient-Safety Website

In 1999, Congress created the Agency for Healthcare Research and Quality ("AHRQ")
within the Department of Health and Human Services ("HHS").  42 U.S.C. § 299(a).  AHRQ's
"purpose . . . is to enhance the quality . . . and effectiveness of health services . . . through the
establishment of a broad base of scientific research and . . . promotion of improvements in
clinical and health system practices."  § 299(b).  Congress required the Secretary of HHS to
"facilitate the creation of, and maintain, a network of patient safety databases that provides an
interactive evidence-based management resource for providers, patient safety organizations, and
other entities."  § 299b-23(a).  AHRQ was tasked with using information gathered via the
network to "analyze national and regional statistics, including trends and patterns of health care
errors."  § 299b-23(c).  Congress further directed that "information resulting from such analyses
shall be made available to the public."  Id.

Early on, AHRQ sought to leverage the power of the internet to build upon a tradition
within the medical profession of learning from mistakes by discussing them with colleagues at
in-person "morbidity and mortality" ("M&M") conferences.  See Doc. No. 26-1 at 19–29.[1]
AHRQ initiated an online series of case studies serving as a nationwide, ongoing M&M
conference aimed at discussing and preventing diagnostic errors.  See id. at 32–40.  Two years
later, in 2005, AHRQ launched the Patient Safety Network ("PSNet"), a "continuously updated
Web-based portal" designed to fill "the need for a comprehensive information resource for those
working in patient safety."  Id. at 42.  By 2007, thousands of subscribers received PSNet's
weekly newsletter.  Id.  In 2015, AHRQ merged its series of case studies into PSNet to create a

---

[1] Citations to "Doc. No. __ at __" reference document and page numbering appearing in the
header appended to each item by the Court's electronic docketing system.

2

unified patient-safety resource.  See id. at 65.  A group of technical experts under contract with AHRQ selected and edited case studies and other submissions for publication on PSNet; a different contractor provided technical support for the site, posting and maintaining its content. Doc. No. 33-1 ¶ 7.  PSNet's editors estimated in 2024 that the site received more than three million page views annually.  Doc. No. 26-1 at 54.

A form on PSNet allowed practitioners to submit information about medical errors they encountered, including a general description of the patient, relevant events and factors contributing to the error, the effects of the error on the patient, and suggestions for avoiding similar errors in the future.  See id. at 79–82.  The editorial team would review submissions, selecting cases to feature on PSNet based on their clinical and educational value, among other criteria.  See id. at 84–88.  Subject-matter experts were then identified and invited to write a case study, or commentary, about the error and lessons to be learned from it.  See id. at 99–101. Expert commentary published on PSNet contained a standard disclaimer informing readers that the content did not represent the views of AHRQ or HHS.  Id. at 113.

B.    The Plaintiffs and Their Commentaries

Dr. Gordon Schiff is a practicing physician and an Associate Professor of Medicine at Harvard Medical School.  Doc. No. 26-2 at 1–2.  Dr. Celeste Royce is a practicing physician and an Assistant Professor of Obstetrics, Gynecology, and Reproductive Biology at Harvard Medical School.  Doc. No. 26-3 at 1–2.  During their decades-long careers, Drs. Schiff and Royce have each researched and written about patient safety.  Id. at 2–3; Doc. No. 26-2 at 2–4.  Each has authored commentaries related to their areas of practice that were selected for publication on PSNet.  See Doc. No. 26-2 at 5; Doc. No. 26-3 at 3–4.  Dr. Schiff has also served on various AHRQ panels and committees related to patient safety and diagnostic error.  Doc. No. 26-2 at 4.

One PSNet commentary by Dr. Royce and one by Dr. Schiff are particularly relevant here, as recent events involving those commentaries gave rise to this lawsuit.

Following a conference she co-led in January 2020, Dr. Royce co-authored a commentary on a case study concerning a delayed diagnosis of endometriosis.[2]  Doc. No. 26-3 at 4.  The draft commentary was submitted to PSNet in early May 2020.  Id. at 5.  An editorial process ensued, during which feedback centered on ensuring the commentary focused on the diagnostic process (as opposed to "the details of endometriosis" or "other medical issues").  Id.  Dr. Royce and her co-author "revised the draft to align more closely with the patient safety focus of PSNet," and the commentary was published on PSNet in June 2020.  Id. at 5–6.  The commentary concluded with a series of "Take-Home Points," the last of which was:

> Although not germane to this particular case, it is important to note that endometriosis can occur in trans and non-gender-conforming people and lack of understanding this fact could make diagnosis in these populations even more challenging.  Therefore, endometriosis should be considered in the differential diagnosis for any person presenting with chronic abdominal or pelvic pain.

Id. at 54.  This language appeared in the draft commentary when it was first submitted to PSNet; it was not the subject of any discussion or feedback during the editing process.  Id. at 5–6.  The published version of the commentary includes a standard disclaimer specifying that the authors were responsible for its contents, which "do not necessarily represent the views of AHRQ" and should not be understood "as an official position of AHRQ or" HHS.  Id. at 58.  This disclaimer appeared on all commentaries published on PSNet.

In September 2021, Dr. Schiff and two co-authors submitted to PSNet a draft commentary on assessing suicide risk.  Doc. No. 26-2 at 6.  The draft was accepted for publication, and an editorial process followed during which a series of revisions occurred

---

[2] "Endometriosis is a condition wherein cells similar to the lining of the uterus grow outside the uterus," which can cause "pain," "excessive bleeding[,] and even infertility."  Doc. No. 26-3 at 4.

through November 2021 in response to peer review and feedback.  Id. at 6–7.  The commentary

was published on PSNet in January 2022.  Id. at 5.  In a section entitled "Approaches to

Improving Safety," the commentary noted the importance of "having knowledge of which

populations are at higher risk of suicide."  Id. at 105.  It went on: "High risk groups include male

sex, being young, veterans, Indigenous tribes, lesbian, gay, bisexual, transgender,

queer/questioning (LGBTQ)."  Id.  A footnote supporting this list of high-risk groups directed

readers to an article in the Journal of the American Medical Association.  See id. at 105, 112

(note 8).  This language was not challenged, nor its scientific accuracy or relevance questioned,

during the editorial process.  Id. at 7.  Dr. Schiff's commentary was also published with the

standard disclaimer.  Id. at 115.

    C.    The EO and Its Impact

The day his second term in office began, President Donald Trump issued an executive

orders entitled "Defending Women From Gender Ideology Extremism and Restoring Biological

Truth to the Federal Government" ("the EO").  Exec. Order No. 14,168 (Jan. 20, 2025).[3]  In the

section stating its purpose, the EO described the need to address "fundamental[] attack[s]" that

"depriv[e] [women] of their dignity, safety, and well-being," and announced the government's

intention to "defend women's rights."  Id. § 1.  Next, the EO established a policy "to recognize

two sexes, male and female," providing definitions of those and other relevant terms.  Id. § 2.

The EO defines "women" to mean "adult . . . human females," and "female" to mean "a person

belonging, at conception, to the sex that produces the large reproductive cell."  Id. § 2(b), (d).  In

the next section, the EO directed a series of agency actions.  Id. § 3.  Relevant here, the Secretary

of HHS was tasked with providing "guidance expanding on the sex-based definitions set forth

_____

[3] The defendants included a copy of the EO with their opposition brief.  See Doc. No. 33-2.

in" the EO.  Id. § 3(a).  The Office of Personnel Management ("OPM") was directed to 1) "implement changes to require that government-issued identification documents . . . accurately reflect the holder's sex," and 2) "ensure that applicable personnel records accurately report Federal employees' sex."  Id. § 3(d).  Federal agencies were obligated to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology."  Id. § 3(e).  No language in the EO required or invited OPM to issue guidance to other agencies about the content of their websites. The EO required agencies to "submit an update on implementation" of the EO to the Director of the Office of Management and Budget ("OMB") within 120 days.  Id. § 7.  The last section of the EO mandated that its implementation occur "consistent with applicable law."  Id. § 8(b).

On January 29, 2025, OPM's Acting Director issued a memorandum entitled "Initial Guidance Regarding [the EO]" ("OPM Memo").  Doc. No. 33-3.  Invoking OPM's authority under a specific federal statute, the OPM Memo instructed every federal agency to take eleven specific actions "[n]o later than **5:00 p.m. EST on Friday, January 31, 2025**," and to produce a report to OPM on implementation of "this guidance" "[n]o later than **12:00 p.m. EST on Friday, February 7, 2025**."  Id. at 2–3 (emphasis in original).  Most of these actions have no apparent connection to the specific commands the EO addressed to OPM.  Only one of the actions is relevant here.  The OPM Memo directed agencies to "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology" ("Takedown Directive").  Id. at 2.

Two days later, on the first deadline set by the OPM Memo, the Acting Secretary of HHS issued a memorandum with the subject line "Action: Initial Guidance Regarding [the EO]" ("HHS Memo"), requiring all "HHS Operating and Staff Divisions" to "tak[e] prompt actions"

complying with and implementing the EO and the OPM Memo.  Doc. No. 33-4.  The HHS

Memo was accompanied by a form each division was required to complete and submit by

February 6, 2025.  Id. at 2.  A flurry of activity followed.  Among the recipients of the HHS

Memo was Margie Shofer, AHRQ's Division Director of General Patient Safety.  Doc. No. 33-1

at 2, 4.  Shofer received the HHS Memo the day it issued and promptly learned that AHRQ's

Office of Communications was "removing all web content that mentions gender and transgender

topics" in response to the Takedown Directive.  Id. at 4–5.

      In short order, Shofer received a list of publications from PSNet that had been identified

for removal using "word searches" targeting "terminology that potentially conflicted with the EO

and [the] OPM Memo's directives."  Id. at 5.  Shofer "narrowed the list . . . to include only that

content that was associated with the issues outlined in the [EO]."  Id.  Nothing in the record

sheds light on what criteria Shofer used to "narrow" the list.  Her "team sent the narrowed list" to

the contractor providing technical support for PSNet and instructed the contractor to remove the

identified articles from the website.  Id.  All of this occurred on Friday, January 31, 2025.  Id.

That evening, Dr. Schiff received an email from PSNet's co-Editor in Chief, Dr. Patrick

Romano, notifying him that his commentary on assessing suicide risk had been removed from

PSNet "due to a perception that it violates the White House policy on websites 'that inculcate or

promote gender ideology.'"  Doc. No. 26-2 at 126.  Dr. Romano attached a copy of the OPM

Memo to his email.  Id. at 8.  In an ensuing exchange, Dr. Romano explained that AHRQ had

been instructed to interpret the OPM Memo as requiring the removal of "anything with the words

'transgender,' 'nonbinary,' or 'gender identity,'" and that this also rendered the acronym

LGBTQ "problematic because it includes that letter T for 'transgender.'"  Id. at 123.

The following Monday, Dr. Romano emailed Dr. Royce to notify her that her endometriosis commentary had been removed from PSNet, citing the same "perception" that had led to the removal of Dr. Schiff's article days earlier.  Doc. No. 26-3 at 74.  In this email, Dr. Romano added that Dr. Royce's "publication ha[d] not been deleted," but was "simply archived so it can be restored to public access at a future time."  Id.  Meanwhile, in response to a request from PSNet's technical-support contractor, Shofer "agreed to try and explore" whether the articles could be "republished" if their content were adjusted.  Doc. No. 33-1 at 5.  The result of that exploration was communicated to the impacted authors, including Drs. Royce and Schiff, in an email from Dr. Romano sent on February 6, 2025.  Doc. No. 26-2 at 132–33.  Per that email:

> AHRQ has received approval to re-post your original commentaries, which we have been discussing over the last several days.  However, the condition is the removal of the problematic words—i.e., the words "transgender" and "LGBTQ."  In the case of [Dr. Schiff's] commentary, this entails simply editing out just three words from a list of risk factors for suicide.  In the case of [Dr. Royce's] commentary, this entails editing out just the very last sentence . . . .  These conditions are non-negotiable.

Id.  Dr. Romano went on to say that "a prominent editor's note" would appear on the restored articles disclosing that they had been "updated . . . to comply with" the EO.  Id. at 134.

Dr. Schiff responded later that day, declining to change his article.  In his view, the required revision would have eliminated "evidence-based peer reviewed information" and "censor[ed] truth out to be replaced by nontruth."  Id. at 132.  He offered "to correct any factual inaccuracies" that the government could identify and support with data or other evidence.  Id.  Dr. Royce responded the next morning, saying she would not agree to delete the identified sentence from her commentary but would "be okay with" revising it to say "endometriosis can occur in any woman and is a rare but possible diagnosis in men."  Doc. No. 26-3 at 78.  Her proposal elicited a series of responses from Dr. Romano.  Later on February 7, he wrote to reiterate that deletion of the sentence was "non-negotiable."  Id. at 80.  He also conveyed "the

Administration's view" that "endometriosis is not a possible diagnosis in men." Id.  Then, on February 10, Dr. Romano emailed again expressing his "surprise" that Dr. Royce's "proposed edit ha[d] been accepted."  Id. at 82.  He predicted that her commentary would "be reposted" by the end of that day.  Id.  A third email from Dr. Romano, sent February 12, reveals that his prediction proved wrong; despite hope on the part of AHRQ that the "edit would fly," other decisionmakers had conveyed that no "reference to transgender no matter how hidden" would be permitted.  Id. at 84.  Dr. Royce's commentary would be reposted only if she "completely remove[d] the final sentence"—a condition she rejected.[4]  Id.

In notifying Dr. Royce of this "backtrack," Dr. Romano also shared that "none of the four other authorship teams given similar deals ha[d] accepted" them to that point in time.  Id.  According to Dr. Romano, implementation of the EO, the OPM Memo, and the HHS Memo by AHRQ resulted in a "total impact" of about twenty items having been removed from PSNet (including the commentaries by Drs. Schiff and Royce).  Doc. No. 26-2 at 123.  Dr. Romano and other PSNet editors had not learned of the removals until after they had occurred.  Id.  Because Drs. Schiff and Royce did not agree to the alterations required as conditions of reposting, their commentaries on suicide risk and endometriosis, respectively, remain unavailable on PSNet.

---

[4] It seems this flip-flopping about Dr. Royce's proposed revision continues.  At the motion hearing, defense counsel represented to the Court that she recently learned the defendants might be amenable to reposting Dr. Royce's commentary with the revised language Dr. Royce proposed months ago—language that the defendants, apparently, now consider consistent with the EO.  This position is memorialized nowhere in the paper record, and the Court cannot (and does not) base its resolution of the pending motion on a factual representation made by counsel near the end of a two-hour, non-evidentiary proceeding that is both at odds with the paper record and unsupported by an affidavit establishing the representation as well as the authority of the relevant official to make and carry out the representation.  If the position counsel described was part of settlement negotiations between the parties, it cannot factor into the Court's decision.  It bears noting, though, that if counsel accurately stated the defendants' present interpretation of the EO, this back-and-forth-and-back-again wavering appears to bolster the plaintiffs' assertion of arbitrary and capricious agency action.

There is nothing in the record suggesting the defendants either took or contemplated taking any further actions relevant to this lawsuit after mid-February.  The deadlines announced in the OPM and HHS memos have passed.

     D.    <u>The Litigation</u>

Drs. Schiff and Royce brought this lawsuit on March 12, 2025.  Doc. No. 1.  They named as defendants OPM and its Acting Director, HHS and its Secretary, and AHRQ and its Acting Director.  <u>Id.</u> at 1, 4.  Drs. Schiff and Royce allege a violation of their right to free speech under the First Amendment, as well as violations of the APA arising from agency actions they assert were arbitrary and capricious and beyond the scope of OPM's statutory authority.  <u>Id.</u> at 24–26.  By March 21, 2025, every defendant had received the Complaint and related Summons.  <u>See</u> Doc. No. 24.

On April 1, 2025, the plaintiffs moved for a preliminary injunction, specifically seeking the following forms of interim relief: 1) an order enjoining the defendants from "from implementing the OPM Memo and/or [the EO] by removing private speech by individuals and organizations on government-run forums"; 2) an order enjoining the defendants "from implementing the OPM Memo and/or [the EO] by refusing to accept, publish, or highlight private speech on government-run forums, or otherwise burdening, restricting, or discriminating against such speech"; and 3) an order requiring the defendants "to restore to PSNet all articles, case studies, and other information removed pursuant to the OPM Memo and/or" the EO.  Doc. No. 25-1 at 1–2.  They supported the motion with declarations by one of their attorneys and Drs. Schiff and Royce, as well as various exhibits.  Doc. Nos. 26-1 to -3.

The defendants timely opposed the motion, submitting their own exhibits, including a declaration by Shofer.  Doc. Nos. 33, 33-1 to -5.  Notably, the opposition papers revealed that HHS's contract with the company that had provided technical support for PSNet ended on March

24, 2025, days after the defendants were served with this lawsuit, and the contract was not renewed.  Doc. No. 33-1 at 3.  According to the defendants, the expiration of the contract means that "PSNet is no longer an active website, and it is unable to accept any new content."  Id.  As of April 14, 2025, it was "unclear if there will be the technical ability to post any new content on PSNet," which remained available online only as "a static website."  Id. at 6.  These intervening events form the basis for some of the arguments the defendants advance in opposition to the plaintiffs' motion, as the Court will discuss below.

The plaintiffs replied and, in doing so, urged that the recent changes to PSNet do not foreclose preliminary injunctive relief.  Doc. No. 37.  The Court held a motion hearing on May 21, 2025.  Doc. No. 41.  During the hearing, the defendants conceded certain points, withdrew at least one argument, and presented some factual updates to the Court, all of which will be described in the relevant sections of the discussion that follows.

## II.    DISCUSSION

In their opposition papers, the defendants pursued three challenges they argued should prevent the Court from reaching the merits of the plaintiffs' motion.  They advanced two reasons they believed the plaintiffs lack standing, then they suggested a lawsuit pending in a District of Columbia ("D.C.") federal court undermined this Court's jurisdiction over the plaintiffs' claims.  The Court need not linger long over these opening challenges.  As explained in the first section that follows, they are meritless.  In the second section, the Court will turn its attention to the traditional preliminary-injunction factors, all of which favor the plaintiffs.  The thorniest question the Court must resolve comes last: What is the appropriate scope of relief in this case?

### A.    Jurisdiction

The first obstacle the defendants sought to place between the plaintiffs and the relief they seek is an argument that Drs. Schiff and Royce lack standing to bring the claims they have

articulated in their Complaint.  Doc. No. 33 at 17.  In their brief, the defendants suggested that

the two doctors impermissibly seek to vindicate the rights of third parties and cannot "show that

their alleged injury likely will be redressed by a favorable decision from this Court."  Id.  The

defendants are wrong on both counts.

Article III of the Constitution "confines the federal judicial power to the resolution of

'Cases' and 'Controversies'" in which a plaintiff can "demonstrate [a] personal stake."

TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2).  To

establish standing under Article III, a "plaintiff must have suffered an injury in fact—a concrete

and imminent harm to a legally protected interest, like property or money—that is fairly

traceable to the challenged conduct and likely to be redressed by the lawsuit."  Biden v.

Nebraska, 600 U.S. 477, 489 (2023).  Where a plaintiff has made the requisite showing, "a

federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging."

Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 126 (2014) (cleaned up).

The defendants' own brief exposed the fatal flaw from which their first standing

argument suffers.  The plaintiffs, the defendants wrote, "assert not only their own rights but those

of third parties" as well.  Doc. No. 33 at 17 (emphasis added).  In other words, the defendants

implicitly acknowledged that Drs. Schiff and Royce are, in fact, asserting "their own rights" and

therefore have personal stakes in this case.  Id.  Defense counsel made this concession explicit

during the motion hearing.  Indeed, one could not read the Complaint and conclude otherwise.

Dr. Schiff alleges that his own First Amendment rights were violated when the defendants

removed from PSNet a commentary he authored.  Dr. Royce complains of an identical violation

of her own rights.  They do not ground their claims in the rights of third parties.  See Doc. No. 37

at 7.  To the extent they seek relief extending to other authors' publications or other government

forums, questions arise regarding the proper scope of any injunction that might issue.  But the fact remains that each plaintiff alleges "a concrete and imminent harm to" their own "legally protected interest."  Nebraska, 600 U.S. at 489.  The first component of standing is plainly satisfied here.

The defendants also attempted to create a redressability problem by arguing they cannot repost content previously removed from PSNet, because they have allowed the website's technical-support contract to lapse.  This theory fails both legally and factually.  Settled law requires that standing be assessed "based on the facts as they existed when the action was commenced."  Ramírez v. Sánchez Ramos, 438 F.3d 92, 97 (1st Cir. 2006).  The record establishes that the alleged impediments to reposting did not arise until nearly two weeks after this action began.  Thus, they cannot negate standing, and the defendants have identified no authority holding otherwise.

In addition, to support their argument that the plaintiffs' injuries are not redressable, the defendants offered evidence that is equivocal at best.  In their papers, the defendants argued that PSNet "has been static since March 24, 2025, and will remain so," meaning it cannot "accept, and will not be accepting, any new content including the re-posting of earlier articles."  Doc. No. 33 at 19; see also Doc. No. 33-1 at 3, 6–7.  The defendants' own statements in their opposition memorandum, Shofer's declaration, and the contemporaneous record say otherwise.  See Doc. No. 26-3 at 74 (informing plaintiffs their commentaries were archived to permit reposting); Doc. No. 33 at 31 (arguing "articles were not completely deleted from PSNet but instead put into an archive, to allow for the possibility of re-posting if future circumstances warranted"); Doc. No. 33-1 at 6 ("At this point, it is unclear if there will be the technical ability to post any new content on PSNet and tag[] the content to make it searchable.").  Moreover, evidence that a specific

13

contractor was exclusively <u>responsible for</u> posting content to PSNet is not proof that no other person working for any of the defendants is <u>capable of</u> restoring a modest number of files to an existing database.  In any event, nothing before the Court plausibly establishes that reposting content to PSNet would not be possible, and defense counsel conceded at the motion hearing that there are one or more persons presently employed by the defendants who could implement an order requiring reposting here.  Of course, this is unsurprising.  From a technical perspective, PSNet appears to be a garden-variety database of PDF documents searchable by the words in the documents as well as various classification fields.  In the Court's experience with electronic discovery in hundreds, if not thousands, of civil and criminal cases, this is a simple task.  For these reasons, the defendants' second standing argument is meritless—and it would remain meritless on the present record even if recast through the lens of mootness.  <u>See</u> <u>Ramírez</u>, 438 F.3d at 97 (explaining "the doctrine of mootness measures whether the plaintiff's interest remains sufficient to justify continuing federal jurisdiction").

Within the portion of the opposition labeled "The Court Lacks Subject Matter Jurisdiction," the defendants urged the Court to "exercise judicial restraint" and await a decision by a D.C. federal judge presiding over another lawsuit challenging the OPM Memo.  Doc. No. 33 at 17, 19–22.  To imply that the D.C. litigation impacts this Court's jurisdiction is simply wrong.  Viewed not as jurisdictional argument, but as a request to exercise discretion over when to engage with the issues presented here, the argument remains meritless.  Putting aside the Court's "unflagging" obligation to exercise jurisdiction, <u>Lexmark Int'l</u>, 572 U.S. at 126, the D.C. litigation involves neither the plaintiffs nor their constitutional rights.  At any rate, the defendants withdrew this claim during the motion hearing.

Having disposed of the defendants' threshold arguments, the Court proceeds to evaluate the merits of the pending motion under familiar legal standards.

      B.   <u>Preliminary-Injunctive Relief</u>

To secure the "extraordinary remedy" provided by a preliminary injunction, the plaintiffs "must establish" that: 1) they are "likely to succeed on the merits," 2) they are "likely to suffer irreparable harm in the absence of preliminary relief," 3) "the balance of equities tips in [their] favor," and 4) "an injunction is in the public interest." <u>Winter v. Nat. Def. Res. Council, Inc.</u>, 555 U.S. 7, 20 (2008); <u>see</u> <u>Nken v. Holder</u>, 556 U.S. 418, 433–34 (2009) (noting "substantial overlap" between tests applicable in preliminary-injunction and APA-stay contexts). Often considered in tandem, "[t]he first two factors of the traditional standard are the most critical." <u>Nken</u>, 556 U.S. at 434; <u>see</u> <u>Vaqueria Tres Monjitas, Inc. v. Irizarry</u>, 587 F.3d 464, 485 (1st Cir. 2009) (noting "irreparable harm is not a rigid" factor, but rather "a sliding scale, working in conjunction with" the first factor). The third and fourth factors of the test "merge when the [g]overnment is the opposing party." <u>Nken</u>, 556 U.S. at 435. The Court will take the factors in turn and explain why each favors the plaintiffs.

      1.   *Likelihood of Success*

There is no dispute that, for First Amendment purposes, PSNet is a limited public forum. Doc. No. 26 at 19–20; Doc. No. 33 at 27; <u>see</u> <u>Pleasant Grove City v. Summum</u>, 555 U.S. 460, 470 (2009) (describing settings in which private speech occurs on government property, including when "a government entity" creates "a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects"). "In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." <u>Summum</u>, 555 U.S. at 470. Though the government "may reserve [a limited public] forum for its intended purposes," any "regulation on speech" it imposes must be "reasonable" and cannot amount to

15

"an effort to suppress expression merely because public officials oppose the speaker's view." Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 46 (1983). Thus, restrictions on private speech in a limited public forum must satisfy two conditions: reasonableness and viewpoint neutrality. If a restriction is reasonable but is not viewpoint-neutral—or vice versa—it will not withstand First Amendment scrutiny.

In their papers, the defendants mostly focused on arguing that the defendants had imposed reasonable restrictions on speech that were required by the EO. See Doc. No. 33 at 27–30. Their reasonableness argument is a nonstarter. Even if it were right—and it is not, for reasons the Court will mention in a moment—that would not diminish the plaintiffs' likelihood of success. The record establishes that the defendants' implementation of the EO produced restrictions on speech that are not viewpoint neutral. The defendants made no meaningful argument to the contrary in their papers, and they admitted at the motion hearing that AHRQ's actions in response to the Takedown Directive amounted to viewpoint discrimination.

"The bedrock principle of viewpoint neutrality demands that the [government] not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses." Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004); cf. Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of L. v. Martinez, 561 U.S. 661, 696 (2010) (noting limitations "unrelated to the content of expression" and restrictions that "do[] not target conduct on the basis of its expressive content" may be deemed "neutral" (cleaned up)). "The essence of viewpoint discrimination is . . . a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." Ridley, 390 F.3d at 82. That is precisely what Drs. Schiff and Royce have alleged—and persuasively supported with declarations and other exhibits.

The commentaries were removed from PSNet because of their expressive content.  By the defendants' admission, they implemented the Takedown Directive by performing word searches to identify all publications that used certain words the defendants deemed inconsistent with the policy expressed in the EO.  Items containing those words were removed without advance notice to the authors or PSNet's editors.[5]  Deletion of the offending words or sentences was a non-negotiable prerequisite for reposting.  Even passing references to people who identify themselves as transgender were deemed contrary to the perspective regarding gender identity set forth in the EO.  Because the plaintiffs refused to change the content of their commentaries by removing words that acknowledged the existence of people who identify themselves as transgender, the defendants did not repost them.

Given these facts, it is difficult to imagine how Drs. Schiff and Royce will <u>not</u> prevail in proving their constitutional claim.  They have established—and, during the motion hearing, the defendants conceded—government conduct that constitutes viewpoint discrimination.  This is a flagrant violation of the plaintiffs' First Amendment rights as private speakers on a limited public forum.  The defendants' only response on this point is an assertion that "the requirement of viewpoint neutrality is not absolute."  Doc. No. 33 at 29.  Essentially, as the motion hearing crystallized, the defendants urge the Court to find that their admitted viewpoint discrimination did not rise to the level of a constitutional violation here.[6]  They offer no authority supporting

---

[5] Defense counsel suggested during the motion hearing that content was removed only after negotiations about possible revisions failed, but the record establishes that authors were notified <u>after</u> removal, and negotiations over possible reposting followed.  <u>E.g.</u>, Doc. No. 26-2 at 126, 132–34; Doc. No. 26-3 at 74, 78, 80, 82, 84.

[6] The reason the defendants believe they could lawfully discriminate based on viewpoint in a setting they agree was a limited public forum is not exactly clear to the Court.  The dialogue during the motion hearing raised several possibilities.  Perhaps they suggest viewpoint discrimination is permitted because the government ran this forum.  (This confuses the government's freedom to limit viewpoints expressed in the government's own speech with the

this position, because there is none.  The two decisions they do cite are unpersuasive; they are

relevant only in the sense that the cases do concern the First Amendment.  See id. (first citing

Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988), which involved restrictions on speech

in public-school setting where students enjoy limited constitutional rights; then citing Estiverne

v. La. State Bar Ass'n, 863 F.2d 371 (5th Cir. 1989), which turned on reasonableness and

involved a viewpoint-neutral restriction).  To the extent the defendants suggest that the plaintiffs'

likelihood of success is diminished because they could publish the commentaries elsewhere, such

speculation is immaterial.  As the Supreme Court has made clear, in a decision upon which the

defendants themselves rely: "If restrictions on access to a limited public forum are viewpoint

discriminatory, the ability of a [plaintiff] to [speak] outside the forum would not cure the

constitutional shortcoming."  Christian Legal Soc'y, 561 U.S. at 690; see Doc. No. 33 at 27

(quoting different language from that case).

Because of the plaintiffs' powerful showing of viewpoint discrimination, the Court need

not delve deeply into whether the restriction at issue here was reasonable.  The plaintiffs have

ably articulated and factually supported two reasons that would support a finding that the

restriction was not reasonable.  Doc. No. 26 at 23–26 (explaining "removals directly contradict

---

prohibition on censoring private speech in limited public forums.)  Perhaps they think viewpoint
discrimination was okay because it only touched on minor points made in the commentaries.
(This is wrong as a matter of law.)  Perhaps they think it was fine because no author had a
general right to have anything published or preserved on PSNet.  (This ignores the fact that these
commentaries were already selected, edited, and published there, as well as the fact that
removing a posting for constitutional reasons is different from removing it for unconstitutional
reasons.)  Perhaps they think that when Executive Branch officials believe a President has told
them to engage in viewpoint discrimination, those officials must do so.  (This ignores the
requirements of the First Amendment as well as the plain language in the EO expressing the
President's direction that officials implement the relevant policy "consistent with applicable
law.")  Regardless of the reason, settled precedent discussed above establishes that viewpoint
discrimination in a limited public forum hosted by the government is unconstitutional.  Period.

the purpose of PSNet as a forum," and identifying vague terms in OPM Memo that invite

"haphazard interpretations" and "arbitrary enforcement").  It suffices for present purposes to

observe that the defendants' assertions of reasonableness are expressed generally, without regard

to the patient-safety purpose of PSNet.  See Doc. No. 33 at 28–29.  The defendants do not

engage with, let alone meaningfully respond to, the authorities cited by the plaintiffs explaining

that reasonableness must be evaluated "in light of the purpose served by the forum."  E.g., Doc.

No. 26 at 23 (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 806

(1985)).  The defendants have offered no evidence or argument showing the decisions to remove

the commentaries had anything to do with patient safety.  To the contrary, the record suggests

their removal, and the revisions required as a condition of reposting, undermine patient safety.

Accordingly, the Court finds Drs. Schiff and Royce are likely to succeed on their First

Amendment claim.

The plaintiffs' APA claims are also likely to succeed, though the Court will address them

only briefly for two reasons.  First, the strong showing of constitutional harm alone supports a

determination that the lead-off factor favors the plaintiffs.  Second, though the First Amendment

violation yielded irreparable harm that compounds daily, the record does not support a finding of

ongoing agency action susceptible to prospective, interim relief.  With that in mind, the Court

turns to the APA claims.  In those claims, the plaintiffs assert that implementation of the

Takedown Directive by all the defendants amounted to final (and, therefore, reviewable) agency

action that was arbitrary and capricious, and that OPM exceeded the scope of its statutory

authority in issuing the Takedown Directive.

The Court finds persuasive and endorses the plaintiffs' briefing on why the removal of

the plaintiffs' commentaries was "final agency action."  See Doc. No. 26 at 26–28; Doc. No. 37

at 11–12; see also Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478 (2001) (explaining

"action" for APA purposes "is meant to cover comprehensively every manner in which an

agency may exercise its power"); Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (describing

"final" agency action as marking "the consummation of the agency's decisionmaking process,"

determining "rights and obligations" and thereby triggering "legal consequences" (cleaned up)).

In urging that the challenged actions were not "final," the defendants took a position undermined

by their own assertions earlier in the same brief.  Compare Doc. No. 33 at 31 (stating removal of

articles was not final because articles "were not completely deleted" but archived to permit

reposting), with id. at 19 (stating injury is not redressable because articles cannot be reposted).

The defendants cannot have it both ways on the facts.

As for the theories underlying the plaintiffs' APA claims, the plaintiffs are likely to

prevail for reasons they carefully explain in their papers.  See Doc. No. 26 at 28–33 (detailing

why agency action at issue was arbitrary and capricious in that it lacked rational explanation and

why OPM Memo was ultra vires given language of statute invoked).  The Court makes two

further observations.  One arises from a comparison of the OPM Memo and the EO.  The EO

identified actions OPM had to take to implement the President's policy on gender identity.  OPM

was instructed by the President to make changes necessary to bring gender-related designations

on "government-issued identification documents" and in the "personnel records" of "Federal

employees" in line with the EO.  Doc. No. 33-2 at 3 (§ 3(d)).  The President did not, in the EO,

direct OPM to issue guidance to other agencies on any topic, let alone regarding the content of

their websites or any limited public forums they hosted.  He also did not task OPM with

establishing government-wide definitions for what it means to "promote" or "inculcate" gender

ideology for purposes of the EO (and the EO itself did not define those terms).[7]  It appears, therefore, that OPM's Director acted well outside the boundaries of the power allocated to his agency by Congress and by the President when he issued the Takedown Directive.  Cf. City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020) (explaining agency cannot act except through power conferred on it by Congress).

The Court's second observation is that the time and manner in which the defendants implemented the EO belies any plausible claim that the agencies acted in anything but an arbitrary and capricious way.  The Takedown Directive instructed agencies to comply in two business days.  HHS relayed that directive internally on the day compliance was due, and by the end of that day, AHRQ had searched PSNet and identified the content it would remove.  This was apparently done without consulting any of PSNet's editors, and without advance notice to the authors.  In communications thereafter, the agency stuck to its initial, firm position that the mere use of certain words (no matter the context) was inconsistent with the EO, and that removal of those words was a condition of reposting.  Wholly absent from this process, it seems, was any consideration or reasoned explanation of what language "promotes" or "inculcates" gender identity or what information furthers the EO's stated purpose of defending individuals it defines as "women."  Cf. California v. U.S. Dep't of Educ., 132 F.4th 92, 98 (1st Cir. 2025) (describing requirements that "agency action be reasonable and reasonably explained" with "understandable" reasons provided connecting "relevant data" to "choice made" (cleaned up)).  Moreover, nothing in the EO mandates the wholesale removal of every use of the term "LGBTQ" from a government-run online forum where medical professionals publish and access peer-reviewed

---

[7] Common sense and any dictionary would suggest that both verbs require more than the mere use of the acronym LGBTQ.

articles about how to safely and accurately diagnose and treat patients.  And, as noted, the EO directs that all actions implementing it conform to "applicable law," which includes the First Amendment.  These facts lend support to the plaintiffs' claim that the defendants acted arbitrarily and capriciously here.

For all of these reasons, Drs. Schiff and Royce are likely to succeed in proving their claims.  The first preliminary-injunction factor weighs heavily in their favor.

### 2. *Irreparable Harm*

The Court's assessment of the strength of the plaintiffs' constitutional claim leads inevitably to a finding of irreparable harm.  The pages the defendants spend summarizing the plaintiffs' credentials are beside the point.  See Doc. No. 33 at 23–26.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion); accord Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, (2020) (per curiam); Maceira v. Pagan, 649 F.2d 8, 18 (1st Cir. 1981).  Where plaintiffs seeking a preliminary injunction "have made a strong showing of likelihood of success on the merits of their First Amendment claim," there "is no need for an extensive analysis of" irreparable harm," as such harm is "presumed."  Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 11, 15 (1st Cir. 2012).

The law on this point could not be clearer.  The inexorable link between a First Amendment deprivation and irreparable harm is not confined to the political-speech context, as defendants fleetingly (and incorrectly) suggest. Compare Doc. No. 33 at 26–27 (relying on Fortuño), with Fortuño, 699 F.3d at 11 (deriving irreparable-harm principles from precedent like Asociación de Educación Privada de P.R., Inc. v. García-Padilla, 490 F.3d 1, 21 (1st Cir. 2007), which involved regulation of speech in educational context where strict scrutiny did not apply),

and Roman Cath. Diocese, 592 U.S. at 19 (applying principle in religious-freedom context after finding restrictions at issue were not neutral vis-à-vis religion). As such, the plaintiffs' strong showing that the removal of their commentaries worked a violation of their First Amendment rights eliminates the need for further examination of irreparable harm. As a matter of law, the second preliminary-injunction factor, like the first, "unquestionably" favors the plaintiffs as far as their First Amendment claim is concerned. Elrod, 427 U.S. at 373.

Different considerations arise as to the APA. The ultra vires and/or arbitrary and capricious actions the plaintiffs attack occurred in the past. Nothing before the Court suggests any ongoing or contemplated action by the defendants pursuant to the Takedown Directive. The deadlines set in both the OPM and HHS Memos passed in early February, and the defendants have represented that implementation of the EO as far as PSNet is concerned is complete. The present record sheds no light on whether or how the defendants continue to implement the Takedown Directive at all, let alone in a context that is factually analogous to the events that unfolded with respect to PSNet. As such, the plaintiffs have not established any separate, ongoing, irreparable harm—apart from the First Amendment injury already discussed—flowing from the alleged violations of the APA and warranting distinct prospective relief. See Steir v. Girl Scouts of the USA, 383 F.3d 7, 16 (1st Cir. 2004) (describing "prospect of future harm" as "essential prerequisite for equitable relief").

3.    *Balance of Harms and Public Interest*

Little need be said about the remaining considerations in light of the foregoing findings regarding the two "most critical" factors. Nken, 556 U.S. at 434. On one side of the balance are significant harms to the plaintiffs and to the public which necessarily flow from the defendants' disregard for basic First Amendment principles, as well as harms to medical practitioners and patients who are now deprived of important patient-safety information. On the other side of the

23

balance is a pair of dubious assertions in the defendants' brief unsupported by any evidence or law. The defendants claim that "being forced to re-post" the commentaries at issue would come at a "cost to AHRQ" and its "overburdened staff" that "at this point is oppressive." Doc. No. 33 at 33; see also id. (claiming restoration of articles would be "onerous" and "likely impossible"). There is not a shred of evidence in the record to substantiate this hyperbolic characterization. Furthermore, defense counsel retreated from this assertion during the motion hearing, citing a recent update from the agencies that technical-support staff have returned to duty (albeit temporarily).

In any event, the record suggests that fewer than two dozen publications were removed from PSNet, including those by Drs. Schiff and Royce, with copies preserved in some fashion. See Doc. No. 26-2 at 123. Any hardship arising from an order requiring the reposting of those materials is of the defendants' own creation. The defendants removed information without regard for the authors' constitutional rights (and, it seems, without regard to the EO's purpose and text). Then they terminated a technical-support contract while litigation was pending in which individuals sought relief that might have been expeditiously implemented by that very contractor. Cf. Dellinger v. Bessent, No. 25-cv-385, 2025 WL 471022, at *10 n.5 (D.D.C. Feb. 12, 2025) ("It's as if the bull in the china shop looked back over his shoulder and said, 'What a mess!'"). Therefore, the Court finds that the last two preliminary-injunction factors decisively favor the plaintiffs, and they are entitled to relief.

C.    Scope of Relief

In the order they originally proposed to the Court, the plaintiffs sought relief reaching beyond PSNet and AHRQ, and beyond speech by the plaintiffs themselves. See Doc. No. 25-1 at 1–2. The plaintiffs somewhat narrowed their request at the hearing, defining two categories of relief the Court will address here. The defendants' papers articulated no alternative position on

relief besides denying it entirely.  See Doc. No. 33 at 16, 34.  During the motion hearing, the defendants implied that, were the plaintiffs to prevail, the Court should limit its order to a requirement that the two commentaries by Drs. Schiff and Royce be restored to PSNet.  In evaluating what relief is warranted, the Court will measure the plaintiffs' requests against the general principle that injunctive relief should be tailored to the parties before it.  Cf. Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (noting "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs").

The first category of relief the plaintiffs seek is the restoration of all content removed from PSNet pursuant to the Takedown Directive as AHRQ implemented it.  The plaintiffs expressly link this request to their First Amendment claims.  The Court has little difficulty finding that the plaintiffs are entitled to an order requiring the defendants to restore complete, unaltered versions of the commentaries by Drs. Schiff and Royce to PSNet.  Such relief is plainly required to prevent further First Amendment injury, which is ongoing and continues to accrue each day their commentaries remain unavailable on PSNet due solely to their expressive content.  This much is straightforward.  After careful review of the plaintiffs' argument and the law upon which it relies, the Court also finds that they are entitled to a restoration order concerning the other content removed from PSNet pursuant to the same policy AHRQ used to identify and remove the commentaries by Drs. Schiff and Royce.

The plaintiffs' First Amendment claim is best understood as a facial challenge to AHRQ's implementation of the Takedown Directive.  Cf. Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010) (treating as facial First Amendment challenge request for relief reaching beyond specific plaintiffs and their circumstances).  The constitutional violation they allege does not turn on the facts specific to their own individual commentaries.  Rather, it is best understood as an assertion

that, when it implemented the Takedown Directive, AHRQ adopted a procedure that was

overbroad and viewpoint discriminatory in all of its applications.  The plaintiffs have offered

evidence that the same word search which led to the removal of their commentaries was applied

generally to PSNet's content.  Publications identified via that search were then removed because

they contained words the agency had deemed per se inconsistent with the EO's purpose.  Put

simply, AHRQ's procedure led to the removal from PSNet of patient-safety-related content,

authored by private parties, on the basis of its expressive content.

      In these circumstances, the plaintiffs have established on the present record that the

AHRQ's procedure is likely "unconstitutional in all of its applications."  Wash. State Grange v.

Wash. State Republican Party, 552 U.S. 442, 449 (2008); see Project Veritas Action Fund v.

Rollins, 982 F.3d 813, 826 (1st Cir. 2020) (treating effort to invalidate statute when applied in

one specific context as facial challenge and affirming finding that statute in that context was

overbroad).  Seen through this lens, the plaintiffs are entitled to an order invalidating the

unconstitutional procedure in all of its applications.  The appropriateness of such relief is

bolstered by the fact that the First Amendment interests at stake are not only those of the

plaintiffs as speakers (i.e., authors of commentaries), but also those of the plaintiffs and other

users of PSNet as receivers of information circulated there.  Cf. Bd. of Educ., Island Trees Union

Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 867 (1982) (describing "right to receive ideas" as

"inherent corollary of the right[] of free speech"); Griswold v. Connecticut, 381 U.S. 479, 482

(1965) (explaining government "may not, consistently with the spirit of the First Amendment,

contract the spectrum of available knowledge").  Accordingly, in addition to the restoration of

the plaintiffs' own commentaries, the Court concludes the plaintiffs are entitled to an interim

order requiring the restoration of all content authored by private parties and removed from PSNet as a result of AHRQ's procedure implementing the Takedown Directive.

The second category of relief the plaintiffs seek is an administrative stay enjoining the defendants from further implementing the OPM Memo in any way. The plaintiffs connect this request to their APA claims. This position suggests, and the Court agrees, that the broader relief within this second category is not necessary to provide complete relief to the plaintiffs for the First Amendment injuries they have suffered. For reasons the Court has cited, the record does not presently support prospective relief on the APA claims in the form the plaintiffs urge. As noted, there is no evidence before the Court suggesting the plaintiffs face ongoing or future harm arising from the OPM Memo, or that the defendants are likely to take further steps to implement the OPM Memo with respect to PSNet or any other government-run forum where the plaintiffs publish or access information in the course of their work. This is not to say the plaintiffs cannot prevail on their APA claims. Indeed, the Court has explained why the record establishes they are likely to do just that. Rather, the denial of this category of relief arises because of the lack of any showing that an interim stay extending to unspecified future implementation and/or other forums is "necessary to provide complete relief to the plaintiffs" while this litigation proceeds. Califano, 442 U.S. at 702.

III.    CONCLUSION

This case is not about whether the EO itself is immune to legal challenges. The plaintiffs have not challenged the EO directly; rather, the plaintiffs attack actions by three government agencies and the officials leading them as they interpreted and implemented the EO. Those actions, the Court has concluded, were almost certainly unlawful. With the Takedown Directive, OPM and its Director arrogated to themselves authority that neither the President nor Congress granted them. HHS required compliance with OPM's ultra vires directives without engaging in

27

any independent and reasoned process of its own.  AHRQ and its leadership implemented the Takedown Directive without regard for the plaintiffs' constitutional rights and in a manner that ultimately undermined the President's stated purpose in enacting the EO.

This case is not about whether PSNet must or should continue to exist.  The plaintiffs have not challenged the change in the website's status, and they have relinquished the requests for relief they originally sought concerning their ability to submit future articles to that forum.  In any event, it is not the Court's role to evaluate the wisdom of restricting access to peer-reviewed scientific information that enhances patient safety by fostering more informed and timely diagnostic care—or of eliminating entirely a free, online repository of patient-safety resources accessed each year by thousands of medical professionals seeking to provide better, safer care to their patients in the United States.  Those are matters for the political branches of government to decide.  It is this Court's obligation, however, to interpret the Constitution and federal statutes and ensure that even government agencies operate within the boundaries the law delineates.  The plaintiffs are likely to succeed in proving that the defendants strayed well beyond those boundaries here.

For the reasons set forth in this Order, the plaintiffs' motion for a preliminary injunction, Doc. No. 25, is ALLOWED to the extent described herein.  Insofar as the motion sought relief beyond that which the Court has deemed warranted, it is DENIED.  A separate order will issue memorializing the preliminary injunction entered by the Court.

SO ORDERED.


 /s/ Leo T. Sorokin
United States District Judge

28